IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **LESLEY KAPLAN,** *on behalf of herself and others similarly situated*, <br> **Plaintiff,** <br><br> v. <br><br> **TRANS UNION, LLC,** <br> **Defendant.** | **CIVIL ACTION** <br><br><br><br> **NO.  24CV2438** |

## OPINION

Plaintiff Lesley Kaplan ("Kaplan") has sued Trans Union, LLC ("TransUnion"), a nationwide consumer reporting agency whose business involves collecting and reporting consumer financial information in the form of credit reports, on behalf of herself and a putative class of similarly situated individuals.  The gist of her complaint is that TransUnion deprives consumers of their rights by failing to comply with the requirements of the Fair Credit Reporting Act ("FCRA") to block the reporting of fraudulent information on credit reports when presented with an identity theft report.  She brings two causes of action: the first under 15 U.S.C. § 1681c-2 is on behalf of a proposed class.  The second is an individual claim brought on her own behalf under 15 U.S.C. § 1681i(a).  Currently before the Court is Kaplan's Motion to Certify the Class pursuant to Federal Rule of Civil Procedure 23, which Motion does not concern her individual claim.

## I.    FACTUAL BACKGROUND

Kaplan carries a Wells Fargo Bank, N.A. ("Wells Fargo") credit card.  She maintains that in the spring of 2023, an unknown person used the card to make two purchases: one, which Wells Fargo approved, at Target in an amount over $900, and the other, a $150 charge at a pizza

1

restaurant, which Wells Fargo declined.  When Wells Fargo notified her of these suspicious purchases, concerned that her identity had been stolen, she filed a report with her local police department as well as an online Identity Theft Report with the Federal Trade Commission ("FTC").

A few months later when she noticed that her TransUnion credit report listed the Target charge as an outstanding debt on her Wells Fargo credit card account, Kaplan wrote a letter to TransUnion explaining the circumstances surrounding the suspected identity theft and requesting that the Target charge be removed from her credit report.  Enclosed with her letter were copies of the police report, her FTC filing, and TransUnion's proprietary dispute form, as well as personal identification documents and proof of residence.

Within a week, TransUnion replied with a form letter, Letter 775, which acknowledged receipt of Kaplan's "identity theft block request" and explained that it "decline[d] to block the information" for the following reasons:

> In accordance with Section 605B of the FCRA, we have determined that your request has either a) been made in error; b) is a misrepresentation of material fact relevant to the request to block and/or c) you have obtained possession of goods, services or money as a result of the transaction at issue.

The letter further explained that TransUnion had "opened a reinvestigation of the disputed information," during which it would "contact the source of the disputed information to advise them of [the] dispute" and "to verify the accuracy of the reported information."  A couple of weeks later, TransUnion sent a follow-up letter indicating that it had contacted Wells Fargo and determined that the disputed charge was legitimate, and therefore would not be removed from her credit report.  Sometime in October 2024, Kaplan and Wells Fargo resolved their dispute, and the Target charge was removed from her credit card account.

## II.    CLASS CERTIFICATION

### A.  Fair Credit Reporting Act

The FCRA "was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3d Cir. 2010) (internal quotations and citations omitted); *see also* 15 U.S.C. § 1681(b) ("[It] is the purpose of this subchapter to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit . . . information in a manner which is fair and equitable to the consumer . . .").

Section 1681c-2 provides a mechanism for consumers to request credit reporting agencies "[b]lock . . . information resulting from identity theft." 15 U.S.C. § 1681c-2 (codifying § 605B). Specifically, credit reporting agencies:

> shall block the reporting of any information in the file of a consumer that the consumer identifies as information that resulted from an alleged identity theft, not later than 4 business days after the date of receipt by such agency of—(1) appropriate proof of the identity of the consumer; (2) a copy of an identity theft report; (3) the identification of such information by the consumer; and[,] (4) a statement by the consumer that the information is not information relating to any transaction by the consumer.

15 U.S.C. § 1681c-2(a).  The statute goes on to provide that credit reporting agencies:

> may decline to block . . . information relating to a consumer under this section, if the consumer reporting agency *reasonably determines* that—(A) the information was blocked in error or a block was requested by the consumer in error; (B) the information was blocked, or a block was requested by the consumer, on the basis of a material misrepresentation of fact by the consumer relevant to the request to block; or[,] (C) the consumer obtained possession of goods, services, or money as a result of the blocked transaction or transactions.

15 U.S.C. § 1681c-2(c) (emphasis added).

Kaplan alleges that for all potential class members, TransUnion willfully and negligently

violated the FCRA by "failing to block information alleged by consumers to result from identity theft despite receiving all documentation required by Section 1681c-2(a)." In her Motion for Class Certification, Kaplan proposes that this Court certify the following class:

> All consumers in the United States and its Territories to whom Defendant sent a "Letter 775," similar in form to the one it sent Plaintiff on October 14, 2023 denying her block request, from two years before filing of the Complaint until the date of any class certification Order in this matter.

### B. Legal standards

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 n.6 (3d Cir. 2008), *as amended* (Jan. 16, 2009) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982) ("*Gen. Tel. Co.*")) ("*In re Hydrogen Peroxide*"). For a class to be certified, the Court must be "'satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are met.'" *Id.* at 309 (quoting *Gen. Tel. Co.*, 457 U.S. at 161). Here, Kaplan seeks to certify a class action under Federal Rule of Civil Procedure 23(b)(3). The Court must therefore answer several questions. *See Danvers Motor Co., Inc. v. Ford Motor Co.*, 543 F.3d 141, 147 (3d Cir. 2008). First, does the proposed class satisfy Rule 23(a)'s requirements that: (1) the class is "so numerous that joinder of all members is impracticable" (numerosity); (2) there are "questions of law or fact common to the class" (commonality); (3) the named plaintiffs' claims and defenses are "typical of the claims or defenses of the class" (typicality); and, (4) "the representative parties . . . fairly and adequately protect the interests of the class" (adequacy)? *Id.*; Fed. R. Civ. P. 23(a). The next question is whether the Rule 23(b)(3) requirements are met. *Danvers*, 543 F.3d at 147; *see Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) ("The party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b). The provision at issue here is Rule 23(b)(3)." (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)

4

("*Wal-Mart*")).  The assessment is whether "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Danvers*, 543 F.3d at 147 (cleaned up); Fed. R. Civ. P. 23(b)(3).

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart*, 564 U.S. at 350.  The moving party must "prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation[,]" as required by Rule 23(a), and, it must do so by a preponderance of the evidence.  *Russell v. Educ. Comm'n for Foreign Med. Graduates*, 15 F.4th 259, 265-66 (3d Cir. 2021) (internal quotations and citations omitted).  Analyzing a motion for class certification thus "calls for findings by the court, not merely a 'threshold showing' by a party, that each requirement of Rule 23 is met." *In re Hydrogen Peroxide*, 552 F.3d at 307.  "[T]he district court must make whatever factual and legal inquiries are necessary and must consider all relevant evidence and arguments presented by the parties . . . even if they overlap with the merits[.]" *Id.* (citations omitted).  However, trial courts are also afforded "broad discretion to . . . frame issues for consideration under Rule 23" *Id.* at 310.

### C.  Discussion

#### i.  *Numerosity*

Both parties agree that if the proposed class is certified it will consist of approximately 280,763 consumers across the United States and its Territories.  TransUnion does not challenge that this number meets the numerosity requirements of Rule 23(a).  And it is right not to do so.  The numerosity requirement is met.  *See, e.g.*, *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 249-50 (3d Cir. 2016), *as amended* (Sept. 29, 2016) (affirming a finding that a class of twenty-

two satisfied numerosity).

### ii. Adequacy

For class certification purposes, the adequacy inquiry serves to "uncover conflicts of interest between named parties and the class they seek to represent." *Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d Cir. 2006) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)). In assessing adequacy, the Court determines whether plaintiff's counsel is "qualified, experienced, and generally able to conduct the proposed litigation[.]" *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007). TransUnion does not challenge the experience, qualifications, and ability of Kaplan's counsel, Francis Mailman Soumilas P.C., which has been certified as class counsel in "over [seventy] cases" and has expertise in FCRA cases.

TransUnion does argue, however, that Kaplan's claims "are . . . antagonistic to the class[,]" *Beck*, 457 F.3d at 296 (quoting *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 55 (3d Cir. 1994)), in that her interests in this litigation do not align with theirs. *See Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 630-31 (3d Cir. 1996) (holding that "serious intra-class conflicts preclude this class from meeting the adequacy . . . requirement"). Specifically, TransUnion argues that Kaplan is in a different position from other potential class members because the Target purchase has already been removed from her credit report and, thus, she has no incentive to pursue equitable or declaratory relief on behalf of absent class members.[1] While at oral argument TransUnion stated that it was withdrawing this argument, it is unclear whether

---

[1] It is abundantly clear that Kaplan does not seek injunctive or declaratory relief; neither her Complaint nor her Motion for Class Certification request those remedies. However, it is noted that there is some ambiguity as to what damages Kaplan seeks. Her Complaint includes requests for statutory, actual, and punitive damages, while her Motion for Class Certification states "[o]nly statutory damages, not individual actual damages, will be sought." At oral argument, Kaplan clarified that she seeks statutory and punitive damages, but not actual damages.

6

that was in whole, or in part.  Therefore, the argument will be addressed in full.

TransUnion is correct that a mismatch of interests could constitute a conflict between plaintiff and class, thereby scuttling adequacy.  *Vanderbilt v. Geo-Energy Ltd.*, 725 F.2d 204, 207-08 (3d Cir. 1983) (noting that "the remedy sought by plaintiff in the [class] action" is a potentially important factor for assessing adequacy).  However, this principle has no application here because the FCRA precludes injunctive or declaratory relief in private actions, so Kaplan's interests do not deviate from those of the class.

By default, "federal courts [possess] the equitable power to issue injunctions [and declaratory relief] in suits over which they have jurisdiction."  *Califano v. Yamasaki*, 442 U.S. 682, 705 (1979); *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) ("Unless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction.").  However, this power is lost when Congress's "clearest command" removes those remedies from courts' toolbox.  *Califano*, 442 U.S. at 705; *Porter*, 328 U.S. at 398.

Turning to the text of the FCRA, the statute's language indicates that Congress intended private plaintiffs to possess equitable remedies only in select circumstances.  Starting with 15 U.S.C. § 1681n and 1681o, under which Kaplan seeks monetary damages, both sections allow for private enforcement of the FCRA and permit recovery for "any actual damages sustained by the consumer." 15 U.S.C. § 1681n(a)(1)(A) & 1681o(a)(1).  Section 1681n provides for statutory and punitive damages as well.  15 U.S.C. §§ 1681n(a)(1)(A) & 1681n(a)(2).  Critically, neither section provides for equitable or declaratory relief, only damages.  In contrast, Section 1681s(a), which allows for administrative enforcement of the FCRA by the Federal Trade Commission ("FTC"), allows for civil penalties, 15 U.S.C. § 1681s(a)(2)(A) & (B), and <u>also</u> explicitly

contemplates injunctive relief under certain circumstances.  15 U.S.C. § 1681s(a)(2)(C).

The differences between these sections drive what remedies are available to private plaintiffs.  When interpreting a statute, courts will "generally presume such differences in drafting to be purposeful."  *United States v. Shulick*, 18 F.4th 91, 108 (3d Cir. 2021) (citing *In re Bayer AG*, 146 F.3d 188, 193 (3d Cir. 1998)).  Under this principle, the contrast between Sections n and o, on the one hand, with Section s, on the other, indicates that Congress intended to limit the availability of injunctive relief to the FTC.  When drafting the FCRA, Congress had the opportunity and wherewithal to include injunctive and declaratory relief in Sections 1681n and o.  Instead, it chose to provide for damages alone, except with respect to the FTC under Section 1681s(a) pursuant to which the agency is empowered to seek injunctive relief.  *Compare* 15 U.S.C. §§ 1681n(a) & o(a) *with* 15 U.S.C. § 1681s(a)(2).  The differences between these three sections evidence that Congress intended to offer agency plaintiffs forms of relief unavailable to private parties.

This interpretation is further supported by Congress's subsequent revisions to the FCRA. In 1996, Congress amended the statute to require that credit reporters disclose consumer credit information to the FBI for "counterintelligence" purposes.  *See* Intelligence Authorization Act for Fiscal Year 1996, Pub. L. No. 104-93, 109 Stat. 961 (1996).  Codified as 15 U.S.C. § 1681u, this provision empowered consumers to sue the government for improperly acquiring their credit information.  Under this heading, private plaintiffs can pursue statutory, actual, and punitive damages under Section 1681u(j)(1)-(3), as well as any injunctive relief necessary to ensure "compliance with the procedures of this section." 15 U.S.C. § 1681u(n).

Here again, the differences between Sections 1681n, o, and u indicate that Congress was deliberate in where it allowed for injunctive relief.  *See Shulick*, 18 F.4th at 108.  The inclusion

8

of injunctive relief in Section 1681u, but not Sections 1681n or o, shows that Congress intentionally curated such relief to be available to private plaintiffs when suing the government, but not otherwise.  *Compare* 15 U.S.C. §§ 1681n(a) & o(a) *with* 15 U.S.C. § 1681u(j) & (n).

Indeed, if one were to read equitable relief into Sections 1681n and o, Section 1681u's explicit grant of such remedies would be rendered superfluous.  That would run contrary to the "cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."  *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001); *United States v. Cooper*, 396 F.3d 308, 312 (3d Cir. 2005) (noting that it is a "well known canon of statutory construction that courts should construe statutory language to avoid interpretations that would render any phrase superfluous.").  If private FCRA plaintiffs, by default, already had access to injunctive relief, Section 1681u(n)'s grant would be duplicative with their pre-existing remedy, and would therefore serve no purpose.  To preserve the efficacy of Section 1681u(n), the better interpretation is that Congress intentionally drafted Section 1681u(n) to allow private plaintiffs access to injunctive relief specifically against the government's violations of the FCRA, because it was not otherwise available.  *See Shulick*, 18 F.4th at 108; *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (refusing to adopt respondent's construction of a statute because it would "render [a portion of the statute] insignificant, if not wholly superfluous [and] [i]t is our duty to give effect, if possible to every clause and word of a statute").

Taken together, the explicit grant of equitable relief to the FTC and plaintiffs who sue the government, coupled with the absence of such relief in Sections 1681n and o, demonstrates Congress's purposeful choice to preclude private plaintiffs from pursuing injunctive relief under those provisions.  *See also Washington v. CSC Credit Servs. Inc.*, 199 F.3d 263, 268 (5th Cir.

9

2000) (holding that Sections 1681n and o do not empower private plaintiffs to seek injunctive relief).

Further, while the Third Circuit has not directly addressed the question of whether injunctive and declaratory relief is available to a private FCRA plaintiff, two of its precedential opinions, *Weiss v. Regal Collections*, 385 F.3d 337 (3d Cir. 2004), *as amended* (Oct. 22, 2004) *and abrogated on other grounds* by *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016); and *Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187 (3d Cir. 2009) ("*Gelman II")*, offer ample reason to conclude that it would also find that no such relief is available. In *Weiss*, an action seeking injunctive and declaratory relief under the Fair Debt Collections Practices Act (FDCPA), 15 U.S.C. § 1692, the court cited with approval the Fifth Circuit's holding in *Washington,* 199 F.3d at 268, that the FCRA does not permit private actions for injunctive or declaratory relief, and used similar logic in ruling that the FDCPA did not allow private actions for the same types of relief. 385 F.3d at 341-42. Also, when, in *Gelman v. State Farm Mut. Auto. Ins. Co.*, the district court dismissed Gelman's FCRA claim, in part because, citing *Washington* and *Weiss*, "injunctive and declaratory relief are not available to Gelman under the FCRA." 2007 WL 2306578, at *9 (E.D. Pa. Aug. 9, 2007) ("*Gelman* I"), that holding was not disturbed on appeal by the Third Circuit. *See Gelman II*, 583 F.3d 187.

Since damages are the only remedy available to Kaplan and the potential class, their remedy-related interests are aligned and there is no risk of antagonism on that ground. Therefore, Kaplan and her counsel have satisfied adequacy under Rule 23(a).

### iii.    Commonality

Turning next to commonality, this element's focus is whether there are common questions of law or fact sufficient to "provide[] the necessary glue among class members to make

adjudicating the case as a class worthwhile." *Newton v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 259 F.3d 154, 182 (3d Cir. 2001), *as amended* (Oct. 16, 2001).  Commonality is satisfied if the named plaintiff shares at least one question of fact or law with the grievances of the prospective class.  *Baby Neal*, 43 F.3d at 56 (citing *In re Agent Orange Prod. Liab. Lit.*, 818 F.2d 145, 166-67 (2d Cir. 1987)); *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013); *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 597 (3d Cir. 2012) ("For purposes of Rule 23(a)(2), even a single common question will do.").  What this means is that if Kaplan can show where just one of her questions overlaps with one that pertains to the prospective class, commonality will be satisfied.  *See Marcus*, 687 F.3d at 597.  The threshold for establishing commonality is low.  *Newton*, 259 F.3d at 182.  All that commonality requires is that "there must be evidence the class proceeding will likely produce a common answer to the question posed." *Allen v. Ollie's Bargain Outlet, Inc.*, 37 F.4th 890, 901 (3d Cir. 2022) (quoting *Wal-Mart*, 564 U.S. at 352).  For the following reasons, Kaplan's posited common question—"whether Defendant's systemic practice of failing to block due to its internal 'denial criteria' violates the FCRA"—satisfies the commonality requirement.

On its face, Section 1681c-2(a) mandates a distinct sequence of events for fraud blocks. Upon receipt of "(1) appropriate proof of the identity of the consumer; (2) a copy of an identity theft report; (3) the identification of [fraudulent information] by the consumer; and[,] (4) a statement by the consumer that the [fraudulent] information is not information relating to any transaction by the consumer[,]" a credit reporting agency "*shall block* the reporting of any information in the file of a consumer that . . . resulted from an alleged identity theft."  15 U.S.C. § 1681c-2(a) (emphasis added).  This block must be in place "not later than [four] business days after the date of receipt" of the consumer's request and documentation.  *Id.*  Once the block is in

place, a credit reporting agency "may decline . . . any block" if it "reasonably determines" any of the three statutory exceptions have been met, *i.e.* the application was either (1) requested or granted in error; (2) predicated on a "material misrepresentation" of fact by the consumer; or, (3) that the requestor "obtained possession of goods, services, or money as a result of the blocked transaction or transactions."  15 U.S.C. § 1681c-2(c)(1).  If a block request is declined under Section 1681c-2(c)(1), the credit reporter must "promptly" notify the consumer within five business days.  *See* 15 U.S.C. § 1681c-2(c)(2) (cross-referencing to 15 U.S.C. § 1681i).

TransUnion's standardized fraud block procedure does not follow this clear statutory schema.  Section 1681c-2(a) requires—as signaled by the inclusion of the word "shall"—that TransUnion <u>must</u> first block the relevant information, then only after a "reasonable determ[ination]" may it decline to block.  But that is not what TransUnion does.

Upon receipt of the required paperwork from a consumer, TransUnion's internal workflow documents reveal that it evaluates the consumer's request through internally generated criteria:

(1) [t]he item was previously reinstated at the creditor's request[;]

(2) the consumer's correspondence lists documents relating to a mortgage, child support documentation, or bankruptcy public record;

(3) an "[a]uto loan or auto lease that has a repossessed status[;]"

(4) any of the accounts in the correspondence were "previously disputed (other than ownership) and was maintained or verified[;]"

(5) any account in the consumer's correspondence reflects at least twelve months of good payment history, or at least six months of good payment history for an auto and student loans);

(6) any of the accounts in the consumer's correspondence have a status of:
    i.  partial payment accepted,
    ii.  paid after charge-off, settled,
    iii.  paid profit loss, or

iv.  "was a charge-off, now paying[;]" or,

(7) Disputed items that were opened before the fraud occurred.

TransUnion's argument is that because it puts each request through this multifactor review process on a case-by-case basis commonality is defeated.  But, without deciding whether these steps are appropriately taken under the statute, they are not reflected in the 280,763 block request letters sent in response to consumers' requests.  TransUnion's first communication with the consumer is a form letter—Letter 775—that uniformly states that the request was denied because TransUnion concluded that one of the Section 1681c-2(c) statutory exceptions applies. The letter is exactly the same in every instance.  TransUnion's description of its internal processes, and the generic nature of its Form Letter 775 suggest that it jumps directly to the Section 1681c-2(c) denial inquiry, rather than issuing the initial block required by Section 1681c-2(a).  Whether this standardized procedure violates the FCRA by skipping the initial block is a common question shared by Kaplan and all potential class members.  Therefore, commonality has been satisfied.  *See Baby Neal*, 43 F.3d at 56; *Marcus*, 687 F.3d at 597.

### iv.    *Typicality*

Rule 23(a)(3) requires that "class representatives [be] sufficiently *similar* to the rest of the class—in terms of their legal claims, factual circumstances, and stake in the litigation—so that certifying those individuals to represent the class will be fair to the rest of the proposed class." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 600 (3d Cir. 2009); *Duncan v. Governor of Virgin Islands*, 48 F.4th 195, 207 (3d Cir. 2022).  The typicality requirement is a "low threshold" in which "even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct."  *Russell*, 15 F.4th at 271 n.4.

TransUnion argues that Kaplan is not a typical plaintiff under Rule 23(a), as: (1) her

13

claim is subject to a unique defense in that her fraud block request is "unique (or at best, highly anomalous)[;]" (2) she did not suffer any cognizable harms; and, (3) her claim materially differs from those denied based on misrepresentation or other reasons.  Each will be considered in turn.

  a.  Kaplan's "Unique" Fraud Block Request Does Not Thwart Typicality

TransUnion first argues that Kaplan's claim is subject to a unique defense, in that her block request was (1) beyond the scope of the FCRA; and, (2) unfulfillable by TransUnion.

While typicality is generally a "low threshold[,]" it can be lost under Rule 23(a)(3) if "the representative is subject to a unique defense[.]"  *Beck*, 457 F.3d at 301; *see also In re Schering Plough*, 589 F.3d at 599-600 (examining plaintiff's typicality in light of her signing a general release and covenant not to sue).  The operative concern regarding unique defenses is that "the representative's interests might not be aligned with those of the class, and the representative might devote time and effort to the defense at the expense of issues that are common and controlling for the class." *Beck* at 297.  Put differently, a unique defense risks becoming a major focus within the litigation thus distracting the named plaintiff from pursuing the class's interests in tandem with their own.  *Id.* at 299-301.

TransUnion argues that it has a unique defense against Kaplan's claims because her block request was both beyond the scope of the FCRA and categorically unfulfillable.  Specifically, her request asked for the deletion of one item from her credit report which request it was unable to fulfill.  TransUnion maintains that credit reporting agencies do not log or store individual credit card transactions, only data from the account as a whole and that, thus, it is incapable of fulfilling the request.  But that argument has already been rejected by the Court in ruling on TransUnion's Motion for Judgment on the Pleadings.  There, the Court explicitly held that, "*any information . . . [is not] limited to new accounts or credit lines; on the contrary, the terms 'any information'*

comfortably contain the type of data Kaplan sought to block—namely, a specific charge on her credit card account alleged to have been made by an identity thief." *Kaplan v. Trans Union, LLC*, 760 F. Supp.3d 268, 273 (E.D. Pa. 2024).[2]   It further found that even if TransUnion were incapable of amending the specifics of Kaplan's credit report, it was nevertheless bound by Section 1681c-2(a) to take some action, to "do *something* to stop the flow" of inaccurate, fraud-based information in its own credit reports. *Id.* at 274.  Indeed, deposition testimony and expert reports, from both sides, indicate TransUnion could have responded to Kaplan's request by "block[ing] or suppress[ing]" the entire Wells Fargo account.  It had options.  Kaplan's argument that typicality is defeated for these reasons has already been rejected and the decision on that matter is the law of the case.  *See Hamilton v. Leavy*, 322 F.3d 776, 786-87 (3d Cir. 2003) ("The law of the case doctrine limits relitigation of an issue once it has been decided in an earlier stage of the same litigation." (internal quotations omitted)).

b.  <u>Kaplan Suffered Typical Harms</u>

TransUnion's next argument that Kaplan has not suffered any cognizable harms and is, thus "in a markedly different position from other putative class members" is, for a number of reasons, untenable here.  Kaplan explains that she wasted time and resources in making her application to TransUnion; suffered emotional distress from the unexplained denial; and incurred informational harms from the publication of inaccurate credit information.  All of these harms are typical of the class and cognizable under the FCRA.

Certainly, the "time and resources [Kaplan] spent preparing her block request and

---

[2] TransUnion has offered no argument or facts to disturb these rulings, so they remain the law of the case. *See Hamilton*, 322, F.3d at 787 ("Reconsideration of a previously decided issue may, however, be appropriate in certain circumstances[.]"); *In re City of Phila. Litig.*, 158 F.3d 711, 718 (3d Cir. 1998) (holding that reconsideration of a previously decided issue may be appropriate under "extraordinary circumstances" such as the presentation of new evidence; the announcement of a new, supervening law, or the earlier decision was clearly erroneous.).

obtaining the appropriate supporting material" are cognizable harms under the FCRA. *See*

*Cortez*, 617 F.3d at 719 ("Time spent trying to resolve problems with the credit reporting agency

may also be taken into account" when calculating damages) (citing *Stevenson v. TRW Inc.*, 987

F.2d 288, 297 (5th Cir. 1993))). Similarly, any anxiety or distress stemming from inaccurate,

fraud-based information in one's credit report can constitute a harm under the FCRA. *See id.*

(holding that "damages for violations of the FCRA allow recovery for humiliation and

embarrassment or mental distress even if the plaintiff has suffered no out-of-pocket losses."

(citing *Philbin v. Trans Union Corp.*, 101 F.3d 957, 963 n.3 (3d Cir. 1996), *abrogated on other*

*grounds by Cortez*, 617 F.3d 688)). And, while the mere presence of inaccurate information in a

credit file does not itself constitute an informational harm, *see TransUnion LLC v. Ramirez*, 594

U.S. 413, 433-34 (2021), publication of that inaccurate information to an external third party can.

*Id.* Here, TransUnion published to Barclays a copy of Kaplan's credit report containing the

inaccurate Wells Fargo debt. That broadcast was sufficient to constitute a recognized

informational harm under the FCRA. *See id.* Furthermore, it does not follow, as TransUnion

suggests, from the fact that Barclays issued Kaplan a credit card, despite the inaccuracy on her

credit report, that she did not suffer an informational harm. *See Cortez*, 617 F.3d at 719 ("[A]

consumer may be awarded actual damages even if she is able to obtain credit after explanation of

the inaccuracy [on her credit report]." (citing *Morris v. Credit Bureau of Cincinnati, Inc.*, 563 F.

Supp. 962, 969 (S.D. Ohio 1983))).

Because Kaplan has alleged harms recognized by the FCRA, TransUnion's arguments

against typicality on that ground are unpersuasive.

> c. There is No Evidence That Kaplan's Interests are Atypical of the Class
> Members' Interests

TransUnion's final argument is that Kaplan is atypical in that her block request was

16

denied for suspected error, while the potential class encompasses persons whose requests were denied based on any of the three statutory exceptions, *i.e.* because they were made (1) "in error" by the consumer; (2) based on a "material misrepresentation of fact by the consumer[;]" or, (3) the consumer obtained goods, services or money as "a result of the blocked transaction." 15 U.S.C. § 1681c-2(c).

But TransUnion provides no factual support for this argument.  In its response to Plaintiff's Interrogatories, it denied tracking how many denials it issues under any criteria.  Of the 280,763 denials at issue here it has provided no data on how many were denied for suspected error, how many for misrepresentation, or how many for receipt of benefits.  And the generic nature of Form Letter 775 contains no indication as to which of the three reasons proffered in the letter precipitated the denial to block, just that it was one of them.

***

In sum, Kaplan has shown by a preponderance of the evidence that the proposed class complies with numerosity, adequacy, commonality, and typicality, as required by Rule 23(a). *See* Fed. R. Civ. P. 23(a); *Russell*, 15 F.4th at 265-66; *Danvers*, 543 F.3d at 147.

### v.    *Kaplan Has Satisfied Rule 23(b)(3)'s Requirements*

Turning now to the factors found in Rule 23(b)(3), Kaplan must now show by a preponderance of the evidence that "[1] questions of law or fact common to class members predominate over any questions affecting only individual members[;] and [2] that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  Each will be addressed separately.

### a.    Predominance

Rule 23(b)(3) requires that the proposed class be sufficiently cohesive as to warrant

17

adjudication by a representative. *Amchem*, 521 U.S. at 622-23. Put more plainly, predominance builds on Rule 23(a) commonality in that it too requires that class members share common questions of fact or law. *See Danvers*, 543 F.3d at 148 ("[W]here an action is to proceed under Rule 23(b)(3), the commonality requirement is subsumed by the predominance requirement" (citing *In re Prudential Ins. Co. of Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 313-14 (3d Cir. 1998) ("*In re Prudential*") (internal quotations omitted)); *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015) (same). However, Rule 23(b)(3) is "far more demanding" than commonality, and requires that the common questions also "*predominate* over individual issues." *In re Hydrogen Peroxide*, 552 F.3d at 310-11 (emphasis added). A common scheme or uniform process often satisfies predominance through generation of common questions of law and fact. *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004) (affirming that predominance was met where "[defendant] engaged in a broad-based campaign . . . to deceive consumers[.]"); *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 380-81 (E.D. Pa. 2015) ("*In re NFL I*"), *aff'd*, *In re Nat'l Football League*, 821 F.3d 410 (3d Cir. 2016) ("*In re NFL II*") (holding that the NFL's uniform suppression of information and failure to modify regulations satisfied predominance, despite variation in class members' specific injuries).

Here, Kaplan argues that the core legal question is whether TransUnion's "standardized" policy of denying fraud block requests based on its internal criteria, then issuing a Letter 775, violates the FCRA. She further argues that all claims in this case will depend on the same core evidence and legal issues, namely: (1) TransUnion's standardized practices and use of internal criteria to deny otherwise-supported block requests; and, (2) the FCRA's mandate that, upon notice of identity theft, credit reporters block information stemming from identity theft. Kaplan finally emphasizes that courts "regularly" find predominance where, as here, plaintiffs seek

18

statutory damages based on credit reporting agencies' unlawful standardized practices.

From the current record, answering Kaplan's legal question will dispose of all class members' claims "in one stroke." *Wal-Mart*, 564 U.S. at 350. According to its internal documentation, TransUnion has standard policies and procedures for assessing fraud block requests. When consumers file their block request paperwork, TransUnion's analysts sort the applications according to company protocol, directing them based on whether the application is believed to be proper; incomplete; "not valid[;]" indicative of error or misrepresentation; or a "mixed file." Unless a request is deemed proper, no initial block is instituted at this time. If an analyst believes a block was requested in error or based on a misrepresentation, TransUnion's agents assess the file again, this time to see if one of (at least) seven internal criteria are met.[3] If any one of those criteria is satisfied, TransUnion denies the request and sends a Letter 775.

From this evidence, every fraud block request—whether belonging to Kaplan, a potential class member, or anyone else—is processed in this manner. Because TransUnion's alleged failure to institute an initial block and its use of internal denial criteria are both common to all potential class members, there is a resultant "common interest in determining whether [TransUnion's] course of conduct is actionable." *In re Prudential*, 148 F.3d at 314. Therefore, answering whether TransUnion's standard block policy violates the FCRA will, in one go, generate a common answer for all class members' claims. *See In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.*, 795 F.3d 380, 399 (3d Cir. 2015) (holding that when "the class was subjected to the same kind of illegal conduct by the same entities, and . . . harmed in the same

---

[3] TransUnion's internal documents list seven reasons to deny a fraud block request as in error or based on a misrepresentation. Kaplan alleges this list is the sole seven reasons used by TransUnion's employees, while TransUnion argues the list is non-exhaustive and simply flags the most common seven.

way," then the resultant common questions "will generate common answers."); *In re Warfarin*, 391 F.3d at 527-28 (affirming that the defendant's "broad-based campaign . . . naturally raise[d] several questions of law and fact common to the entire class and which predominate over any issues related to individual class members.")  Such common answers regarding a common scheme support a finding of predominance.

TransUnion offers a multi-faceted rebuttal.  Its overarching argument is that this case in fact turns on individualized inquiries, meaning common claims and evidence will not predominate.  It first maintains that there is no standardized or uniform policy: every fraud block is decided on a case-by-case basis.  This matters because, according to TransUnion, causation is the "overarching question" in this case, specifically whether it "**wrongfully** denied" the class members' block requests.  Therefore, TransUnion contends, resolving the class claims will require probing each class member's denial to determine its righteousness.  It concludes that such individualized scrutiny smother common issues, defeating predominance.

This argument is unpersuasive because the reasons for denying individual requests are not the focus of this process-focused class claim.  At oral argument, the Parties clarified that the crux of the case is the relationship between TransUnion's internal criteria and the three statutory exceptions.  According to Kaplan, unless TransUnion's "proxies" are 100% correlated with one of the three statutory exceptions, then its internal criteria are simply stand-ins aimed at non-statutory conditions and therefore violate the FCRA.  Conversely, TransUnion proffers that its use of proxies violates the FCRA only if the internal criteria are completely unrelated to the statutory exceptions, and that it is allowed leeway to implement the FCRA's "inexact" standards for denial of a block.  Neither of these frameworks require a dive into the merits of individual denials.  As such, causation does not risk overwhelming common questions of fact with

20

individualized inquiries, and the predominance requirement of Rule 23(b)(3) is met.

        b.   <u>Superiority</u>

Turning now to superiority, this factor, like numerosity, calls for an "inquiry into judicial economy[,] and places great weight on whether the individual members can bring their own claims." *In re Modafinil*, 837 F.3d at 253 n.11. Where class members are unlikely to file individual actions due to negative cost-benefit calculations or "individually [they] would be without effective strength to bring their opponents into court at all[,]" class certification is superior. *Amchem*, 521 U.S. at 617; *In re Prudential*, 148 F.3d at 316 (finding class certification is superior where individual claims are small or modest).

Here, class litigation is the superior method of adjudication in that the FCRA's statutory damages are quite modest at $100-$1000 per violation, 15 U.S.C. § 1681n(a)(1)(A), and, thus, each potential class member is unlikely to bring suit much less secure legal representation for such an effort. Here, a class action "facilitates spreading the litigation costs among the numerous injured parties and encourages private enforcement of the statute[.]" *In re Warfarin*, 391 F.3d at 533; *Amchem*, 521 U.S. at 617; *In re Prudential*, 148 F.3d at 316.

***

In sum, Kaplan has shown by a preponderance of the evidence that the proposed class satisfies Rule 23(b)(3)'s predominance and superiority requirements. *See* Fed. R. Civ. P. 23(b)(3); *In re Hydrogen Peroxide*, 552 F.3d at 307.

An appropriate order follows.

                  **BY THE COURT:**

                  S/ **WENDY BEETLESTONE**

                  _____

                  **WENDY BEETLESTONE, C.J.**

21