**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

LESLEY KAPLAN, on behalf of herself and all others similarly situated,

   *Plaintiff*,

  v.

TRANS UNION LLC,

   *Defendant*.

Case No. 2:24-cv-02438-WJB

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSTION TO DEFENDANT TRANS UNION LLC'S MOTION TO PARTIALLY EXCLUDE THE OPINIONS AND <u>TESTIMONY OF EVAN HENDRICKS</u>**

John Soumilas
James A. Francis
Lauren KW Brennan
**FRANCIS MAILMAN SOUMILAS, P.C.**
1600 Market Street, Suite 2510
Philadelphia, PA 19103
(T) 215-735-8600
(F) 215-940-8000
jsoumilas@consumerlawfirm.com
jfrancis@consumerlawfirm.com
lbrennan@consumerlawfirm.com

Erika A. Heath
**FRANCIS MAILMAN SOUMILAS, P.C.**
351 California Street, Suite 700
San Francisco, CA 94104
(T) 628-246-1352
(F) 215-940-8000
eheath@consumerlawfirm.com

## I.    INTRODUCTION AND BACKGROUND

Plaintiff Lesley Kaplan opposes Defendant Trans Union LLC's Motion to Partially Exclude the Opinions and Testimony of Evan Hendricks (ECF 80, the "Motion"). Kaplan alleges that Trans Union failed to comply with the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681c-2, by failing to block information alleged by consumers to have resulted from identity theft. To aid the finder of fact in understanding the business context in which her claim arises, Kaplan relies on the opinions of Evan Hendricks, a nationally recognized expert who has regularly been found qualified to provide expert testimony on all aspects of the credit reporting industry.[1]

Hendricks has been recognized as an expert by the Federal Trade Commission, Congress, Consumer Reporting Agencies ("CRAs"), and numerous federal courts. In this case, Hendricks offers opinions that will aid the finder of fact in understanding and contextualizing identity theft and the business landscape that CRAs like Trans Union operate within, including industry jargon and tools and boilerplate forms regularly used when CRAs communicate with consumers. Trans Union's Motion, which seeks to exclude certain portions of Hendrick's Supplemental Report (ECF 80, 80-1), is more accurately a motion going to the weight, credibility, and bias of Hendricks, than to his ability to testify as an expert under Fed. R. Civ. P. 702. Because Hendricks's opinions and testimony meet the flexible standards under that rule, the Court should deny Defendant's motion.

Trans Union objects to testimony on three topics. First, Trans Union seeks to exclude Hendricks from testifying about the general credit reporting industry ecosystem, including the key

---

[1]    *See* Ex. 1, Excerpt of Trial Transcript for *Matthew Kirkpatrick v. Equifax, LLC,* Case No. CV-02-1197-MO (D. Or. Jan 18, 2005) at 4-5 ("As a general statement, what I'm allowing and the reason I'm allowing it is testimony that puts the particular actions of the defendant in particular here in context, in the context of the nationwide problem of identity theft, in the context of the congressional reaction to that and other issues in the credit-reporting industry, when he can by virtue of his study and his prior testimony, both in court and to Congress, make comparisons, then that's something that's helpful to the jury.").

players, market pressures and incentives, and placing the facts of this case into context within that industry. Second, Trans Union objects to testimony concerning its policies and procedures, the tools available to CRAs, and how the industry typically uses those tools to solve specific problems, such as handling a general tradeline dispute versus a fraud-block request. Last, Trans Union seeks to preclude Hendricks's testimony about the sources and types of guidance CRAs often receive.

Trans Union's Motion should be denied. First, Hendricks's testimony regarding the credit reporting industry is reliable, based on his extensive experience, and is well within the bounds of permissible expert testimony. As explained further below, Trans Union confuses speculation with inference, and it seeks to hold Hendricks to a higher standard than Rule 702 by arguing that Hendricks must provide explicit citations to specific documents to support his inferences, although expert opinions may be based upon many things, including the expert's experience in the field.

Second, Trans Union confuses legal conclusions with a comparison to the industry norm. Hendricks's testimony concerns Trans Union's policies and procedures and the tools available to CRAs, like the Automated Credit Dispute Verification ("ACDV") process. Trans Union incorrectly argues that Hendricks reaches legal conclusions when opining on whether Trans Union used the right tool for the job. But, as explained below, these tools are not required by law, and Hendricks does not opine as to any of Trans Union's duties arising under the law, but rather focuses on industry practices.

Third, Trans Union seeks to exclude Hendricks's discussion of relevant guidance documentation, like regulatory actions and civil suits, arguing that no specialized knowledge is required to understand them. But this is untrue and it misunderstands the importance of Hendricks's testimony to the layperson, which is not, as Trans Union argues, simply pointing out that these sources of guidance exist. Rather, Hendricks's testimony weaves this evidence into the

broader context of how the credit reporting industry works. Rather than usurping the fact finder's duty concerning an element of Kaplan's case (willful non-compliance), Hendricks helps the fact finder understand technically complex information, allowing them to ultimately decide that issue.

A lay witness, such as Plaintiff Lesley Kaplan, cannot be expected to know the history and operational structure of the credit industry, its keys players such as "furnishers" and "users," its business practices and dynamics, its jargon and tools, and the guidance available to all actors in that business.  Hendricks has studied, published and testified about the credit reporting industry for decades.  Preventing Plaintiff from relying on Hendricks to provide context and meaning in this case would be very prejudicial. If Defendant thinks that Hendricks can be effectively cross-examined, it will get its opportunity to do just that. But its arguments now are not a basis to outright exclude significant parts of his opinions and testimony.  As more fully explained below, the Motion should be denied.

## II.    LEGAL STANDARD

If scientific, technical or specialized knowledge will "assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed. R. Civ. P. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). The Third Circuit has interpreted this rule as having three requirements. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994). First, a witness proffered to testify to specialized knowledge must be an expert. *Ibid*. This requirement is interpreted liberally and is satisfied by a broad range of knowledge, skills, and training. *Ibid*.

Second, the expert must testify to scientific, technical, or other specialized knowledge that will assist the trier of fact. *Paoli*, 35 F.3d at 742. (quoting Fed. R. Civ. P. 702). This Circuit's

jurisprudence, before and after *Daubert*, holds that an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable. *United States v. Downing*, 753 F.2d 1224, 1237 (3d Cir. 1985) (before *Daubert)*; *Paoli*, 35 F.3d at 742 (after *Daubert*). In determining reliability, a litigant "has to make more than a prima facie showing that his expert's methodology is reliable[,]" but the "evidentiary requirement of reliability is lower than the merits standard of correctness." *Pineda v. Ford Motor Co.*, 520 F.3d 237 (3d Cir. 2008) (citing *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786).

Additionally, as originally interpreted in *Daubert*, "knowledge" refers to "any body of known facts or to any body of ideas *inferred from such facts* or accepted as truths on good grounds." *Daubert*, 509 U.S. at 590, 113 S. Ct. 2786 (citing Webster's Third New International Dictionary 1252 (1986)) (emphasis added). Inferences are an acceptable part of expert testimony and are also contemplated by Fed. R. Civ. P. 703, which outlines the permissible bases for an expert's opinion testimony. *See* Fed. R. Civ. P. 703 advisory committee's note (2011) ("any 'inference' is covered by the broader term 'opinion.'").

Finally, the expert's testimony must "fit" the case. *Paoli*, 35 F.3d at 742-43. Fit embodies Rule 702's requirement that the testimony aid the trier of fact, and it requires that the testimony be relevant to an issue in the case. *See id.*; *Daubert*, 509 U.S. at 591, 113 S. Ct. 2786.

### III.    ARGUMENT

**A.    Hendricks' Testimony On Market Forces And Business Structures And Incentives Is Reliable Because It Is Based On Experience And The Record In This Case.**

Two of Trans Union's challenges to Hendricks's testimony concern Hendricks's opinions on the credit reporting ecosystem and how that ecosystem affects CRA's business incentives and practices. ECF 80 at 3-9, 11-13. Hendricks opines that, based on his experience, CRAs face market pressure to serve the interests of their Users, not consumers, and that this pressure leads CRAs to

engage in practices that provide Users with more, and not less, information, even if that information cannot be assured to be accurate. Ex. 2, Hendricks Supplemental Report, at 3.[2] This preference for more information often comes at the expense of accuracy because these forces drive CRAs to provide consumer reports that may contain information which no longer belongs in the report. Ex. 2 at 5.

Trans Union challenges the reliability of this testimony as based on "rank speculation." ECF 80 at 2; s*ee Paoli*, 35 F.3d at 742 (discussing speculation during the reliability analysis). But Trans Union confuses speculation with inference and context. Hendricks permissibly draws *inferences* based on his experience and the facts before him in this case, and he provides Trans Union with specific examples of market forces that lead him to his conclusions. *See infra* p. 9.

To start, Trans Union criticizes Hendricks for being unable to cite to a particular study or report that supports his opinion that there exists within the credit reporting industry a de facto arrangement which leads to incentivizing Users over consumers. ECF 80 at 6-8, 13. It similarly dismisses this opinion as speculative because Hendricks has never worked for or advised a CRA or financial institution. *Id*. at 11. But Trans Union does not point to a single authority stating that an expert must either work the kind of job the expert is discussing or point to documents that explicitly cite the inference the expert makes. It cannot, because its insistence that Hendricks identify a particular study proving every market force or incentive he describes imposes a requirement not found in either Rule 702 or the relevant caselaw. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150–52 (1999) ("*Daubert* makes clear that the factors it mentions do

---

[2]  Users are the "creditors/lenders that purchase credit reports from CRAs. They are banks, credit unions, financial institutions, credit card companies, mortgage lenders, insurance companies, and can even be individuals. They are those who intend to use the consumer's credit information for some permissible purpose." Ex. 2 at 2.

6

*not* constitute a 'definitive checklist or test'") (emphasis in original); *Paoli*, 35 F.3d at 742 ("the expert must have 'good grounds' for his or her belief").

Rather, as the case law requires, Hendricks shows that he has good grounds for his testimony; both Trans Union in this Motion and numerous courts across the country have acknowledged his wealth of experience. S*ee* ECF 80 at 1 (acknowledging four decades of experience in the credit reporting industry); s*ee also, e.g., Ma v. Equifax Info. Servs., LLC*, 288 F. Supp. 3d 1360, 1366 (N.D. Ga. 2017) ("Mr. Hendricks has a wealth of experience regarding credit reporting agency practices, and an expert may be qualified on the basis of experience."). Hendricks was an observer of the credit reporting industry for over two decades. He knows who supplies information to CRAs, who purchases their reports, and at what prices. He knows what data is useful to Users, has written a book on the industry, and has testified before Congress on credit reporting topics. *See* Ex. 3, Hendricks CV. He has also served as an expert for over two decades in numerous credit reporting industry cases, and this experience has also given him access to confidential information that others are never able to see. *See id*.; Ex, 4, Hendricks Dep. Tr. at 140:15-141:5. This experience is well documented and rare for an industry with tight control over access to outsiders. Defendant may not like the conclusions Hendricks arrives at from his knowledge base, but that is not a basis to exclude his testimony.

Hendricks also clearly connects his experience to his opinions, and he provides specific examples that showcase his specialized knowledge. For example, in addition to his full expert report and CV, during his deposition, Hendricks discusses his studying, research, and writing about the credit reporting industry (Ex. 4 at 32:21-33:2), his observations of CRAs like Trans Union (Ex. 4 at 54:8-14), and his work as an expert witness (Ex. 4 at 140:15-19). This is the exact same experience courts have held as reliable even in the cases Trans Union relies on in its Motion. *See*

*Reilly v. Vivint Solar*, No. 1:18-CV-12356-NLH-JS, 2020 WL 3047546 at *5 (D.N.J. June 8, 2020); *Valenzuela v. Equifax Info. Servs. LLC*, No. CV-13-02259-PHX-DLR, 2015 WL 6811585 at *2 (D. Ariz. Nov. 6, 2015); *Anderson v. Equifax Info. Servs., LLC*, No. 2:16-CV-2038-JAR, 2018 WL 1542322 at *4 (D. Kan. Mar. 29, 2018); *see also Ma* 288 F. Supp. at 1366; *see also* Ex. 3.

Based on this experience, Hendricks opines about the players, market structure, market forces and pressures, and the normal practices of the consumer reporting industry, including the relationship among consumer reporting agencies, furnishers, and users of credit information. Ex. 2 at 1-5. These subjects are appropriate for experience-based expert testimony because they involve industry practices and operational context outside the ordinary knowledge of laypeople. *See Nationwide Life Ins. Co. v. Commonwealth Land Title Ins. Co.*, No. CIV.A. 05-281, 2011 WL 204619 (E.D. Pa. Jan. 20, 2011) (allowing expert testimony on custom and practice of insurance industry).

For example, a layperson is not expected to know the tools available to CRAs, like the ACDV process, the fraud block process, or the e-OSCAR system. *See* Ex. 2 at 6-8. A layperson is also unlikely to know the intricate relationships between CRAs and Users, particularly with respect to the business model of CRAs, how CRAs supply information to Users and consumers, and how these sometimes-competing dynamics influence the actions of the industry players. *See id.* at 4-9. Without context, a lay jury will not be able to fully appreciate why Trans Union may be inclined to use certain "proxies" in declining consumer block requests, why it may want to first check with a major User like Wells Frago before blocking any Wells Fargo credit data, or why it may prefer to send an ACDV to Wells Fargo, instead of blocking its account, within the context of this case. Hendricks helps set the stage and explain all these actions.

Contrary to Trans Union's argument that this industry ecosystem testimony is supported only by his "amorphous" experience, Hendricks provided a non-exhaustive list of specific examples and documents that make up the totality of his experience, and which provide foundation for his opinions.[3] *See* Ex. 4 at 35:9-20 (NCLC study); 37:2-5 (general conduct); 38:7-14, 48:6-11 (ACDVs); 39:10-17 (partial matching); 51:5-10 (TU's 775 Letter); 83:20-84:2 (auto lenders); 87:20-88:20 (FACTA and its adoption as a means to combat identity theft); 143:20-144:4 (CFPB action against Equifax). Hendricks's testimony is also based on the record in this case; his opinions are tied to litigation documents, Kaplan's credit report, the fraud-block correspondence, the ACDV correspondence, and Trans Union's Letter 775. Ex. 5, Hendricks's Original Report, at 8. Because Hendricks provided appropriate and reliable grounds for his opinions – his decades of experience in the industry as applied to the relevant issues in this case – his testimony must be heard by the jury.

**B.    Hendrick's Testimony About Trans Union's Policies And Procedures Has A Solid Foundation And Does Not Contain Legal Conclusions.**

Trans Union's second argument takes issue with four statements in Hendricks's testimony concerning Tran Union's reliance on the ACDV process in handling Kaplan's dispute. ECF 80 at 9. First, Trans Union makes much of the fact that Hendricks did not review certain internal policy and procedure documents when opining on this issue. *See id*. at 10. But this is a red herring:

---

[3]    And it makes sense, given the nature of his testimony, that Hendricks must rely more on his qualitative experience than on citation to a particular report, as Trans Union wants. *See* ECF 80 at 6. Hendricks is opining on the *default* arrangement of the credit reporting industry. *See* Ex. 4 at 130:22-23; 136:3-6. He does not assert that CRAs and users have an *explicit* agreement to sacrifice accuracy for profit or information. *Compare* Ex. 4 at 44:18-20 ("No, I don't recall them explicitly saying that, but that's certainly the inference that I drew from it.") *with* ECF 80 at 2 (labeling Hendrick's testimony as a "scheme"). This testimony draws on "the totality of the documents [he's] seen" in his prior work. Ex. 4 at 48:7-8; *see also id*. at 88:13-20; 143:20-144:4.

Hendricks's testimony must only have good grounds for his opinions because Rule 702 "does not require a review of every document or piece of information available[.]" *Walsh/Granite, JV v. HDR Eng'g, Inc.*, No. 2:17-CV-00558-NBF, 2020 WL 13876902 at *4 (W.D. Pa. June 15, 2020). Rather, Trans Union's argument is a matter for cross-examination. *See ibid.*

Hendricks opines that that even though Kaplan properly requested her block, Trans Union instead relied on the ACDV system, rather than certain industry-standard block request tools, when it took action concerning her request. Ex. 2 at 7-8, 10. Hendricks reached those opinions based on his review of the Letter 775 and the ACDV exchanges, which he clearly stated provide evidence of Trans Union's policies and procedures. *See id.* at 1; 7-10; Ex. 4 at 52:7-16 (discussing Letter 775), 61:2-7 (same), 62:14-19 (same), 63:9-19 (discussing Letter 775 and ACDV process), 119:17-23 (discussing Letter 775), 120:21-121:6 (same), 134:1-4 (discussing ACDV process). Hendricks's testimony is based on facts, lengthy expertise, and the record before him, and even to the extent any of his testimony is "shaky but admissible," the Court should cede weight-of-the-evidence issues to the jury and rely on the traditional safeguards of the adversary system – cross-examination, presentation of contrary evidence, and instruction on the burden of proof – to test this evidence. *See In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*, 509 F. Supp. 3d 116 (D.N.J. 2020) ("To the extent any of the causation experts' analyses are "shaky but admissible," Defendants ought to raise these issues on cross-examination before the fact finder. It is the role of the adversarial system, not the Court, to highlight weak evidence.") (internal citations omitted).

Second, Trans Union further criticizes these four statements as improper legal conclusions. ECF 80 at 9-10. Trans Union's argument misunderstands Hendricks's testimony and the applicable law, and Trans Union's sole citation indicates that Hendricks' testimony is permissible. In

*Berckeley Inv. Group, Ltd. v. Colkitt*, the Third Circuit held that an expert's testimony was partially impermissible when that testimony "implicate[d] legal duties." 455 F.3d 195, 218 (3d Cir. 2006).

Hendricks's testimony does no such thing. Instead, Hendricks discusses the fact that, when responding to Kaplan's fraud block request, Trans Union relied on the ACDV process rather than following the normal blocking or suppression process. *See* Ex. 2 at 7-8; Ex. 5 at 4-5. He discusses the tools available to CRAs like Trans Union, and when and how those tools are used in the industry. *See* Ex. 2 at 8 ("Yet despite these key differences between blocking and ACDV processing, Trans Union nevertheless uses ACDVs in connection with blocking requests such as Plaintiff's.") This testimony does not concern Trans Union's *legal duties* under the FCRA, but rather its business decisions and how those decisions square with the rest of the industry. See Ex. 2 at 7-9; Ex. 5 at 4-5.

Importantly, the FCRA *does not* contain the phrases ACDVs, e-OSCAR, or suppression. These are industry-created tools. *See* Ex. 5 at 4-5 ("The CRAs created cloaking/suppression/soft delete[.]"); Ex. 2 at 6 (The ACDV [process is facilitated by the industry's automated system, e-OSCAR."). So, when Hendricks opines that Trans Union "improperly relies" on the ACDV process while processing block requests, this is not a statement concluding that Trans Union violated its legal obligations arising under FCRA section 1681c-2, since ACDVs are not part of the FCRA or ever mentioned in the statute. Instead, it is a fact-based opinion by an expert in the industry stating that Trans Union chose a poorly made tool for the job (ACDVs) as compared to other tools (such as "suppression") available to the industry but also not specifically enumerated as a legal standard under the FCRA. Whether the decision to use that specific tool led to Trans Union violating the FCRA remains a question for the fact finder.

11

**C.      Trans Union Is Also Wrong To Mischaracterize Hendrick's Testimony As "State Of Mind Testimony," And The Cases It Relies On Show This.**

Trans Union seeks exclusion of testimony it characterizes as speculation about Trans Union's motive, intent, or state of mind. Again, Trans Union confuses Hendricks's testimony. The criticized testimony talks generally about the business dynamics of CRAs, Users, Furnishers and consumers. *See* ECF 80 at 11-12 (10 out of 12 statements either do not mention Trans Union at all or only do so by stating that Trans Union is a CRA). Many of Hendricks's opinions that Trans Union maligns in this argument are also discussed above. *See supra* III(A). Again, this testimony does not discuss the "mens rea" of specific actors. Hendricks does not say, for example, that Trans Union *intentionally* or *negligently violated the FCRA*, or that Trans Union *seeks or intends* to create policies and procedures that harm consumers.

Instead, he provides context to the lay jury by explaining the general market pressures and incentives that influence the way the credit reporting industry works, including how CRAs utilize different tools and processes in different situations, and objective observations about the dynamics between industry actors. *See* Ex. 2 at 1-3 (discussing the key industry players), 3-4 (what financial institutions want from CRAs), 4-5 (market pressures on CRAs), 5-7 (ACDV process), 7-8 (fraud blocking process), 8-10 (linking the previous business dynamics to Trans Union's actions).

A layperson cannot be expected to know the specialized terminology, business incentives, practices, and ins and outs of the credit reporting industry, the players in the industry, or how the industry works. *See Anderson*, 2018 WL 1542322 at *4 ("A layperson is likely not to have this detailed knowledge, and the Court finds that Hendricks's testimony regarding the nature of credit reports, FCRA standards[…] and Defendant's "inner workings" would be helpful to the trier of fact in understanding both credit industry standards and Defendant's policies and procedures[.]"). Hendricks's testimony aids the finder of fact by providing necessary context and linking the

conduct of CRAs like Trans Union to the market forces he describes. But without that important context, a lay jury cannot fully understand the business of credit reporting and how business needs and priorities may come in conflict with consumer rights and the FCRA.

Even for the two statements specifically linking those market forces to Trans Union's actions, the district court cases Trans Union relies on do not contradict the distinction between "state of mind" and market pressures. Hendricks's testimony does not embrace any ultimate legal issues, like negligence, willfulness, or whether Trans Union violated the FCRA. *See Wolfe v. McNeil-PPC, Inc.*, 881 F. Supp. 2d 650, 661-62 (E.D. Pa. 2012) (concerning testimony about negligence); *Reilly*, 2020 WL 3047546 at *6 (concerning testimony about negligence and/or intentionality of crafting policies and procedures).[4] Hendricks's testimony also does not discuss what Trans Union did or did not consider or what it knew or concluded. *See Anderson*, 2018 WL 1542322 at *5.

In *Anderson v. Equifax Info. Servs., LLC*, the Court held that Hendricks's testimony discussing what the CRA-defendant "sees [as] its fundamental role[]" was speculative and not supported by sufficient facts or data. 2018 WL 1542322 at *5. That is not the case here, where Hendricks's testimony provides context to the lay jury by discussing the general market pressures on CRAs and also where he provides ample facts and data to support his conclusions.

**D.    Hendricks Properly Contextualizes Important And Relevant Secondary Sources That Will Aid The Finder Of Fact.**

Trans Union's argument concerning information Hendricks relied upon in reaching some of his opinions, specifically documents which it argues require no specialized knowledge or

---

[4]    Trans Union also relies on *Valenzuela*, 2015 WL 6811585 at *3, for this argument. However, the Valenzuela Court simply stated, without analysis or discussion as to any statements made by Hendricks, that Hendricks could not testify about state of mind issues. *See id*.

experience to understand, also fails. Hendricks relies on regulatory actions, prior litigation, press releases, and Trans Union's own admissions as a basis for discussing the kinds of guidance the credit reporting industry receives and from what sources it receives that guidance. *See* Ex. 2 at 9-10. This information is technically complex, and a layperson cannot be expected to understand how this guidance informs Trans Union's decisions. For example, a layperson will not know how two civil suits that provided the CRAs with binding guidance clarifying that reinvestigation procedures are not limited to parroting information from the furnisher informs how the credit reporting industry currently operates. *Id*. at 9. Hendricks cites these sources as further evidence of the credit reporting industry ecosystem, and his testimony will assist the trier of fact in understanding the tapestry of sources from which CRAs receive guidance, the kinds of issues on which they receive guidance, and how this affects their business decisions. These questions are directly related to an element of Kaplan's claim (willful non-compliance), and Hendricks's testimony here aids the finder of fact in making a willfulness determination, but it does not usurp that role.

**E.    Hendricks' Testimony Fits The Case.**

Trans Union's arguments about "fit" are also unpersuasive. Rule 702 requires that specialized knowledge help the trier of fact understand the evidence or determine a fact in issue. *See also Daubert*, 509 U.S. at 591, 113 S. Ct. 2786. Here, Hendricks's testimony explaining consumer reporting industry practices, the different tools available to CRAs when facing different kinds of problems, and the practical relationships among CRAs, Users, and consumers would assist the trier of fact in understanding the business context within which Trans Union operates and in evaluating the reasonableness of Trans Union's conduct.

14

Again, the cases Trans Union cites support this conclusion. *See Reilly*, 2020 WL 3047546 at *5 (finding Hendrick's testimony will assist jury); *Valenzuela*, 2015 WL 6811585 at *2 (same); *Anderson*, 2018 WL 154322 at *4 (citing *McDonough v. JPMorgan Chase Bank*, No. 4:15-cv-00617-JCH, 2016 WL 4944099, at *2 (E.D. Mo. Sept. 16, 2016) for the same); *see also Ma*, 288 F. Supp. at 1366 ("Mr. Hendricks has a wealth of experience regarding credit reporting agency practices, and an expert may be qualified on the basis of experience."); Ex. 3.

A lay jury here must come to know what CRAs typically know or are likely or expected to know as actors in the credit reporting industry.  A jury must learn who the key actors in the business are, what are some key terms, and what technology and tools are available to CRAs like Trans Union.  Hendricks's testimony is helpful on all of those fronts and thus "fits" this case.  A jury cannot decide what is reasonable or what is reckless in this case without understanding at least parts of the credit reporting business.  Reasonableness or recklessness cannot be judged without context.  Explaining the context is Hendricks's major contribution to this case.

## IV.    CONCLUSION

For the reasons set forth herein, Plaintiff respectfully requests that the Court deny Trans Union's Motion to partially exclude the opinions of Evan Hendricks.

Dated: June 4, 2026

Respectfully,
LESLEY KAPLAN
by her attorneys,

BY: /s/ *John Soumilas*
John Soumilas
James A. Francis
Lauren KW Brennan
**FRANCIS MAILMAN SOUMILAS, P.C.**
1600 Market Street, Suite 2510
Philadelphia, PA 19103
(T) 215-735-8600
(F) 215-940-8000
jsoumilas@consumerlawfirm.com

15

jfrancis@consumerlawfirm.com
lbrennan@consumerlawfirm.com

Erika A. Heath
**FRANCIS MAILMAN SOUMILAS, P.C.**
351 California Street, Suite 700
San Francisco, CA 94104
(T) 628-246-1352
(F) 215-940-8000
eheath@consumerlawfirm.com

*Attorneys for Plaintiff and the Class*

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was electronically filed on this date and that service is

therefore being made electronically on counsel of record for Defendant.

Date: June 4, 2026                              /s/ *John Soumilas*
                                                John Soumilas