# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LESLEY KAPLAN, on behalf of herself and
all others similarly situated,

      *Plaintiff*,

    v.

TRANS UNION LLC,

      *Defendant*.

Case No. 2:24-cv-02438-WJB

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR <u>SUMMARY JUDGMENT</u>

John Soumilas
James A. Francis
Lauren KW Brennan
**FRANCIS MAILMAN SOUMILAS, P.C.**
1600 Market Street, Suite 2510
Philadelphia, PA 19103
(T) 215-735-8600
(F) 215-940-8000
jsoumilas@consumerlawfirm.com
jfrancis@consumerlawfirm.com
lbrennan@consumerlawfirm.com

Erika A. Heath
**FRANCIS MAILMAN SOUMILAS, P.C.**
351 California Street, Suite 700
San Francisco, CA 94104
(T) 628-246-1352
(F) 215-940-8000
eheath@consumerlawfirm.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................ii

I.      INTRODUCTION.................................................................................................. 1

II.     PROCEDURAL HISTORY.................................................................................... 3

III.    LEGAL STANDARD ............................................................................................ 4

IV.     ARGUMENT ......................................................................................................... 5

      A.    Kaplan Has Suffered Concrete Harm, Which This Court Has Already
          Acknowledged ............................................................................................ 5

      B.    This Court's Finding That Kaplan Requested A Block Is Also
          Confirmed By The Evidence .................................................................... 8

      C.    Willfulness Is A Jury Question Here, As It Usually Is ................................... 10

          1.    Trans Union's Reading of The Statutory Text is Objectively
              Unreasonable .........................................................................................11

          2.    There Also is Case Law to Put Trans Union on Notice About its
              Obligations ........................................................................................... 14

          3.    There are Genuine Issues of Material Fact Regarding Trans
              Union's Willfulness ............................................................................ 16

      D.    Given The Clear Statutory Text, Trans Union Cannot Meet Its High
          Burden To Show The Statute Is Unconstitutionally Vague ............................ 20

      E.    Trans Union Further Failed Its Reinvestigation Duties Under Section
          1681i ....................................................................................................... 22

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ashwander v. Tennessee Valley Auth.*,
297 U.S. 288 (1936)...................................................................................................21

*Burton v. United States*,
196 U.S. 283 (1905).....................................................................................................20

*Consumer Data Indus. Ass'n v. King*,
678 F.3d 898 (10th Cir. 2012) ....................................................................................15

*Cortez v. Trans Union LLC*,
617 F.3d 688 (3d Cir. 2010)...............................................................................9, 11,23

*Cushman v. Trans Union Corp.*,
115 F.3d 220 (3d Cir. 1997)..................................................................15, 20, 24, 26

*Edwards v. Toys 'R' Us*,
527 F. Supp. 2d 1197 (C.D. Cal. 2007) ....................................................................10

*F.T.C. v. Wyndham Worldwide Corp.*,
799 F.3d 236 (3d Cir. 2015)........................................................................................22

*Haykuhi Avetisyan v. Experian Info. Sols., Inc.*,
No. CV 14-05276-AB (ASX), 2016 WL 7638189 (C.D. Cal. June 3, 2016).........15

*Horton v. Trans Union, LLC*,
No. 12-2072, 2015 WL 1055776 (E.D. Pa. Mar. 10, 2015) ....................................10

*Kaplan v. Trans Union, LLC*,
760 F.Supp.3d 268 (E.D. Pa. 2024) ............................................................................3

*Kelly v RealPage, Inc.*,
47 F.4th 202 (3d Cir. 2022) ....................................................................................7, 9

*Lara v. Experian Info. Sols., Inc.*,
625 F. Supp. 3d 1062 (S.D. Cal. 2022)......................................................................25

*Norman v. Trans Union, LLC ("Norman I")*,
479 F. Supp. 3d 98 (E.D. Pa. 2020) .......................................................................5, 3

*Norman v. Trans Union, LLC ("Norman II")*,
669 F. Supp. 3d 351 (E.D. Pa. 2023) ..........................................................4, 6, 7, 11

*Osada v. Experian Info. Sols., Inc.*,
  290 F.R.D. 485 (N.D. Ill. 2012)................................................................................1

*Osada v. Experian Info. Sols., Inc.*,
  No. 11 C 2856, 2012 WL 1050067 (N.D. Ill. Mar. 28, 2012) ...................................15

*Ramirez v. Trans Union, LLC*,
  No. 12-cv-00632-JSC, 2017 WL 5153280 (N.D. Cal. Nov. 7, 2017) a*ff'd*
  *Ramirez v. TransUnion LLC*, 951 F.3d 1008 (9th Cir. 2020), *rev'd and*
  *remanded on other grounds,* 594 U.S. 413 (2021) ...................................................20

*Reyes v. Equifax Info. Servs., L.L.C.*,
  140 F.4th 279 (5th Cir. 2025) ...................................................................................26

*Robertson v. Allied Sols., LLC*,
  902 F.3d 690 (7th Cir. 2018) .....................................................................................6

*Robinson v. Holiday Universal, Inc.*,
  No. CIVA 05-5726, 2006 WL 2642323 (E.D. Pa. Sept. 11, 2006) .........................22

*Romero v. Monterey Fin. Servs., LLC*,
  No. 19-CV-1781 JM (KSC), 2021 WL 268635 (S.D. Cal. Jan. 27, 2021) ..............25

*Rubin v. HSBC Bank USA, NA*,
  717 F. Supp. 3d 266 (E.D.N.Y. 2024) ......................................................................26

*Safeco Ins. Co. of Am. v. Burr*,
  551 U.S. 47 (2007)..............................................................................................10,11

*Seamans v. Temple Univ.*,
  744 F.3d 853 (3d Cir. 2014)..................................................................................10, 11

*Sessa v. Trans Union, LLC*,
  74 F.4th 38 (2d Cir. 2023) ........................................................................................24

*Simonson v. IQ Data Int'l, Inc.*,
  698 F. Supp. 3d 1055 (W.D. Wis. Oct. 16, 2023)....................................................25

*Slantis v. Capozzi & Assocs., P.C.*,
  2010 WL 4878846 (M.D. Pa. Aug. 10, 2010) ..........................................................10

*Stone v. Troy Constr., LLC*,
  935 F.3d 141 (3d Cir. 2019).........................................................................................4

*Suluki v. Credit One Bank, NA*,
  666 F. Supp. 3d 403 (S.D.N.Y. 2023).......................................................................25

*United States v. Nat'l Dairy Prods. Corp.*,
372 U.S. 29 (1963)..................................................................................................22

*Wood v. Credit One Bank*,
277 F. Supp. 3d 821 (E.D. Va. 2017) .................................................................25

**Statutes**

15 U.S.C. §§ 1681–1681x. ................................................................................ *passim*

Plaintiff Lesley Kaplan ("Plaintiff" of "Kaplan") hereby responds in opposition to the Motion for Summary Judgment filed by Defendant Trans Union LLC ("Defendant" or "Trans Union"), ECF 82.

## I.    INTRODUCTION

Identity theft is a massive problem in this economy. It is estimated to affect 20% of U.S. consumers in their lifetime, costing them (and the U.S. economy as a whole) billions of dollars every year.  JA 458 (at fn. 2, $12.5B in 2024).

Congress became worried about this growing problem as early as 2003, and thus amended the Fair Credit Reporting ("FCRA") "to increase protection for victims of identity theft." *Osada v. Experian Info. Sols., Inc.*, 290 F.R.D. 485, 488 (N.D. Ill. 2012) (citing Pub.L. 108–159 (December 4, 2003)). In the months leading up to that enactment, Trans Union specifically assured the House Subcommittee on Financial Institutions and Consumer Credit  that "Consumer reporting agencies ["CRAs"] play an important role as part of the solution to identity theft. In essence, the consumer reporting agency is tasked with sorting out accurate information about the consumer, and maintaining it, while deleting any information from the credit file that may be the result of an identity theft." Statement of Harry Gambill, Chief Executive Officer, Trans Union, LLC, at 9 (June 12, 2003), available at https://financialservices.house.gov/media/pdf/061203hg.pdf.

Apparently agreeing with Trans Union that CRAs are "part of the solution to identity theft," Congress carefully drafted section 1681c-2, which imposed a clear duty on CRAs to block information in a consumer report that relates to identity theft. 15 U.S.C. § 1681c–2(a). The CRA must do so swiftly – within four days – and only has discretion to deny or rescind such a block in limited circumstances, *after* it made a "reasonable determination" that one of three statutory exceptions applies. 15 U.S.C. § 1681c–2(a) - (c).

1

But, as this Court found, "that is not what Trans Union does." ECF 87, at 12.[1] Instead, Trans Union maintains a secret, internal set of factors used to routinely deny consumer identity theft requests – a set of factors that Defendant created out of whole cloth. Not only do these secret factors fail to match the statutory exceptions of section 1681c-2, but they are not communicated to anyone – ensuring that consumers waste time and resources submitting blocking requests to Trans Union that are doomed to fail. When Trans Union inevitably denies these requests, it misleadingly communicates to consumers that it supposedly made a determination pursuant to one of the three FCRA statutory exceptions. It does not tell consumers that they may add a statement of dispute to their credit files, as section 1681c-2 also requires. The company then kicks the dispute over to the furnisher of the information (one if its customers) to reinvestigate pursuant to section 1681i and waits for the furnisher's response, which typically takes 30-45 days.

Remarkably, Trans Union's motion reveals that its section 1681i reinvestigation also is not helpful to consumers like Kaplan. Defendant does not even attempt to argue that it reasonably reinvestigated Kaplan's claim pursuant to that standard reinvestigation process. Instead, Trans Union insists that (despite its "reinvestigation" actions) it was not even required to reinvestigate Kaplan's dispute under section 1681i because her identity theft claim was a "legal dispute" and not a "factual" one. Therefore, in the company's view, Kaplan's identity theft problem was never Trans Union's problem. At any rate, Trans Union did as its furnisher (Wells Fargo) instructed, which is its usual response, and continued to include the fraudulent information on Plaintiff's credit report which it continued to sell.

The facts of this case show that in the 23 years since Congress created identity theft protections, Trans Union has willfully and systematically offloaded its crucial duties to furnishers.

---

[1]    Citations to pages of ECF-filed documents herein refer to the ECF-stamped page numbers on the top right.

Contrary to the assertions in Trans Union's brief, this process was implemented deliberately and recklessly, despite the clear statutory command of section 1681c-2. Further, it has caused significant concrete harm which cannot be understated – as the procedures have resulted in the wrongful denial of well over 280,000 blocking requests. In short, Trans Union is not "part of the solution to identity theft," as the company assured Congress at the time. Instead, Trans Union has become part of the problem.

As discussed further below, Trans Union's motion for summary judgment must be denied.

## II.     PROCEDURAL HISTORY

Plaintiff Lesley Kaplan filed a Class Complaint in this matter on June 5, 2024. ECF 1. On August 12, 2024, Defendant Trans Union, LLC filed its Answer. ECF 17.

On October 2, 2024, Trans Union filed a motion for judgment on the pleadings (ECF 19) which the Court denied in its entirety on December 18, 2024. ECF 27; *Kaplan v. Trans Union, LLC*, 760 F.Supp.3d 268 (E.D. Pa. 2024).

After a period of class discovery, Plaintiff filed a Motion for Class Certification on September 25, 2025. ECF 40. After full briefing and oral argument, the Court granted Plaintiff's Motion for Class Certification by a 21-page Opinion on April 29, 2026. ECF 87. Trans Union is currently seeking permission to take an interlocutory appeal of the certification decision with the Third Circuit, a request which Plaintiff opposed and remains pending as of the date of this brief.

In granting class certification the Court made several observations about Plaintiff's claims and Trans Union's defenses based upon the facts of record. Because those facts are laid out in detail in the class certification briefing and that order, as well as in the separate statements of fact in this motion, Plaintiff will not recite them again in detail here. Of import to the instant motion for summary judgment, the Court observed:

- "TransUnion's standardized fraud block procedure does not follow [the] clear statutory schema" of Section 1681. "TransUnion must first block the relevant information, then only after a 'reasonable determination' may it decline to block. But that is not what TransUnion does." ECF 87 at 12.

- Trans Union's internal denial criteria "are not reflected in the 280,763 block request letters sent in response to consumers' requests." *Id.* at 13.

- "TransUnion maintains that credit reporting agencies do not log or store individual credit card transactions, only data from the account as a whole and that, thus, it is incapable of fulfilling the request. But that argument has already been rejected by the Court in ruling on TransUnion's Motion for Judgment on the Pleadings." *Id.* at 14.

- "[E]ven if TransUnion were incapable of amending the specifics of Kaplan's credit report, it was nevertheless bound by Section 1681c-2(a) to take some action, to 'do *something* to stop the flow' of inaccurate, fraud-based information in its own credit reports. Indeed, deposition testimony and expert reports, from both sides, indicate TransUnion could have responded to Kaplan's request by "block[ing] or suppress[ing]" the entire Wells Fargo account. It had options." *Id.* at 15.

- "Kaplan explains that she wasted time and resources in making her application to TransUnion; suffered emotional distress from the unexplained denial; and incurred informational harms from the publication of inaccurate credit information. All of these harms are typical of the class and cognizable under the FCRA." *Id.*

The class certified in this case consists of approximately 280,763 consumers across the country. *Id.* at 5.

On May 5, 2026, the Court granted Plaintiff's motion to exclude certain opinions of Defendant's expert report by Troy Rubes. ECF 73. Currently pending are two *Daubert* motions filed by Trans Union: a motion to partially exclude the opinions and testimony of Evan Hendricks, a motion to exclude the opinions and testimony of Kermit Roosevelt. ECF 80, 81.

### III.    LEGAL STANDARD

Summary judgment may be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Stone v. Troy Constr., LLC*, 935 F.3d 141, 147 n.6 (3d Cir. 2019)

4

(denying summary judgment as to willfulness under the Fair Labor Standards Act). In making this determination, the Court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Id*. (quoting *Prowel v.Wise Bus. Forms, Inc*., 579 F.3d 285, 286 (3d Cir. 2009)).

<h3 style="text-align:center">IV.   ARGUMENT</h3>

**A.   Kaplan Has Suffered Concrete Harm, Which This Court Has Already Acknowledged**

Trans Union first attempts to escape accountability for its practices by downplaying the resulting harm in this particular case, and arguing that Kaplan lacks standing. However, the Court has already rejected a similar argument and concluded that "[a]ll of these harms [suffered by Kaplan] are… cognizable under the FCRA." ECF87 at 15.

When it comes to Article III standing, "[t]he injury-in-fact requirement is intended to 'distinguish a person with a direct stake in the outcome of a litigation – even though small – from a person with a mere interest in the problem.'" *Norman v. Trans Union, LLC ("Norman II")*, 669 F. Supp. 3d 351, 369 (E.D. Pa. 2023) (quoting *United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 689 n.14 (1973)). "This standard has been described as 'not Mount Everest,' and demands only that the plaintiff 'allege some specific, identifiable trifle of injury.'" *Id* (quoting *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005), and *Cottrell v. Alcon Laboratories*, 874 F.3d 154, 162 (3d Cir. 2017)).

The recent *Norman* case provides helpful guidance here, as it analyzed an analogous FCRA violation by this very same defendant. In *Norman*, the plaintiff disputed a hard inquiry on his Trans Union credit report. Upon receiving such a dispute, Trans Union's practice was to refuse to investigate the dispute (despite the requirement that it conduct a reinvestigation under section 1681i), and it would instead send a "502 Letter" to the consumer that would advise the consumer

5

"to contact the creditor directly." *Norman v. Trans Union, LLC ("Norman I")*, 479 F. Supp. 3d 98, 110-111, 129-130 (E.D. Pa. 2020). The *Norman* court found standing to exist for multiple reasons, including that the consumers wasted time and expense on disputes that were doomed to fail. As the court explained, "[b]ecause of Trans Union's blanket policy of ignoring disputes over hard inquiries – a policy unknown to consumers – any time spent in lodging the dispute was invariably in vain and therefore wasted." *Norman II*, 669 F. Supp. 3d at 372-373.

As this Court recognized, Trans Union has implemented a similar blanket policy ignoring its statutory obligations in the context of fraud blocks as well, by "skipping the initial block" required under FCRA section 1681c-2(a) and moving directly to the section 1681c-2(c) denial. ECF 87 at 13.

Just as in *Norman*, Trans Union's blanket policy has inflicted multiple cognizable harms on class members. First, as in *Norman*, Kaplan and other class members have expended wasted time, money and resources to gather and send documents that Trans Union advised were supposed to result in a "block," but instead turned out to be wasted endeavors. JA 515-16 at 136:11-137:16; JA 517 at 138:19-23; JA 518-19 at 139:2-140:14; JA 520 at 141:2-14; JA 521-22 at 142:2-143:18; JA 524-26 at 200:17-202:9. Plaintiff's expert has opined that there is an ascertainable economic impact in the form of wasted time and resources on consumers who submit block requests that meet the requirements of FCRA section 1681c-2(a) but who do not receive a block. JA 462.[2] As in *Norman*, this Court has already acknowledged that these wasted resources are real injuries. ECF 87, at 16 ("Certainly, the 'time and resources Kaplan spent preparing her block request and obtaining the appropriate supporting material' are cognizable harms under the FCRA."). Trans Union dismisses these harms and claims that "[t]he cost of a postage stamp should not be the entry

---

[2]    In fact, the *Norman* court relied upon the opinion of the same expert to find standing satisfied based upon consumers' wasted time in preparing futile disputes. *Norman II*, 669 F. Supp. 3d at 373.

fee for a class action." ECF 82-1 at 11. Pithy as it may be, that statement mischaracterizes the evidence that Kaplan attributed significant time to trying to ascertain what she needed to say to Trans Union, what documents she needed, and how she was supposed to submit those to Trans Union. JA 524-26 at 200:17-202:9. *See Norman II*, 669 F. Supp. 3d at 372-373 (citing cases). Defendant's contention also ignores the concrete economic consequences calculated by Plaintiff's expert.  JA 462. All that effort for naught. JA 515-16 at 136:11-137:16; JA 517 at 138:19-23; JA 518-19 at 139:2-140:14; JA 520 at 141:2-14; JA 521-22 at 142:2-143:18 (estimating five to six hours spent per CRA blocking request, including research time). All that effort for naught.

Second, Trans Union exacerbated that harm through its lack of transparency. Trans Union's unclear and misleading Letter 775 left Plaintiff with no idea why Trans Union denied her block request or what, if anything, she could do remedy the purported deficiency in her request. JA 518-19 at 139:2-140:14; JA 523 at 168:15-23; JA 525 at 201:18-24; JA 526-27 at 202:19-203:5; JA 528-29 at 210:10-211:9; JA 530-31 at 219:12-221:11; JA 533-34 at 228:9-229:12. Minimally, Trans Union was required under sub-section 1681c-2(c)(2) to inform consumers within 5 business days that they may add a statement to dispute to their files. A business's failure to provide useful FCRA statutorily-required information to consumers like Kaplan has, by itself, been found to be sufficient to confer Article III standing in this and other circuits.  *Kelly v RealPage, Inc*., 47 F.4th 202, 211-215 (3d Cir. 2022) (Article III standing is "informational injury" in FCRA case where statutorily mandated disclosure of source of information is not provided); *Tailford v. Experian Info. Sols*., Inc., 891 F. 3d 749, 1100-1101 (9th Cir. 2022) (deprivation of FCRA mandated disclosure sufficient for Article III standing); *Robertson v. Allied Sols., LLC*, 902 F.3d 690, 696 (7th Cir. 2018) (FCRA informational right deprivation sufficient for standing).

Third, as this Court stated " any anxiety or distress stemming from inaccurate, fraud-based information in one's credit report can constitute a harm under the FCRA." ECF 87, at 16. Plaintiff's detailed testimony confirmed that she experienced exactly these types of harms as a result of Trans Union's failure to implement a block. JA 518-19 at 139:2-140:14; JA 523 at 168:15-23; JA 525 at 201:18-24; JA 526-27 at 202:19-203:5; JA 528-29 at 210:10-211:9; JA 530-32 at 219:12-221:11; JA 533-34 at 228:9-229:12. Such harms are expected, widespread and common among victims of identity theft, particularly those whose concerns are not addressed.  JA 461-62.

As this Court has already held, and as the evidence now confirms, Article III standing is supported by multiple concrete injuries in this case. Trans Union's efforts to escape the effects of these harms falls flat.

**B.    This Court's Finding That Kaplan Requested A Block Is Also Confirmed By The Evidence**

For at least the third time, Trans Union again raises its dubious argument that Kaplan allegedly did not request a block. This tired argument, which the Court has already rejected multiple times, is no more compelling now on summary judgment.

Section 1681c-2 requires Defendant to "block the reporting of *any information*" within four business days of receiving the four required pieces of information. 15 U.S.C. § 1681c-2(a). As this Court has repeatedly found, "the terms 'any information' comfortably contain the type of data Kaplan sought to block—namely, a specific charge on her credit card account alleged to have been made by an identity thief." ECF 28 at 7; ECF 87 at 14-15. When rejecting this argument most recently, the Court explained this particular issue is law of the case. ECF 87 at 15 n. 2 ("TransUnion has offered no argument or facts to disturb these rulings, so they remain the law of the case.") (citing *In re City of Phila. Litig.*, 158 F.3d 711, 718 (3d Cir. 1998)).

Moreover, the record developed in discovery has not shown any new material facts with regards to this argument. Plaintiff's October 9, 2023 communication to Trans Union explicitly identified that her Wells Fargo account was subject to transactions that were the result of identity theft, and included appropriate proof of her identity, a copy of an identity theft report, identification of the information that resulted from identity theft, and a statement that the information did not to relate to any transaction by her.  JA 084-95.

Trans Union highlights that Plaintiff's letter does not include the word "block."  ECF 82-2 at ¶ 25. But FCRA section 1681c-2 contains no requirement that the consumer explicit request a "block" or use the word "block" in their request. 15 U.S.C. § 1681c-2. And the Third Circuit has rejected the proposition that consumers must use specific statutory terminology in order to vindicate their rights under the FCRA, in light of the statute's "consumer oriented objectives" which "support a liberal construction" of the FCRA's provisions and mandate that "any interpretation of this remedial statute must reflect these objectives." *Cortez v. Trans Union LLC*, 617 F.3d 688, 706 (3d Cir. 2010); *Kelly*, 47 F.4th 202, 219-21 (holding that consumers need not use specific terminology to trigger a CRA's obligation to provide a full file disclosure pursuant to FCRA section 1681g(a)). Furthermore, Trans Union itself interpreted Plaintiff's letter at the time of its receipt as an identity theft block request that included all required elements. JA 477 at 42:1-4; JA 494 at 31:4-10. Its lawyer's *post hoc* spin is irrelevant.

Contrary to Trans Union's assertions, and as this Court recognized in its class certification decision based on the evidence of record, discovery has confirmed that Trans Union had the ability to implement a block consistent with Plaintiff's request.  ECF 87 at 15 ("[Deposition testimony and expert reports, from both sides, indicate TransUnion could have responded to Kaplan's request by 'block[ing] or suppress[ing]' the entire Wells Fargo account. It had options."); JA 289, 296; JA

9

280 at 88:21-24; JA 537 at 103:1-25; JA 461; JA 009 at 122:12-17. In fact, Trans Union's own witnesses testified at deposition that Trans Union indeed *could have* blocked the fraudulent Wells Fargo/Target credit account or at least the balance on that credit account. JA 280 at 88:21-24. The evidence here plainly supports the conclusion that this balance information is recorded and retained by Trans Union and that Trans Union could have blocked it, but chose not to. Trans Union's motion for summary judgment on this issue must be denied.

## C.      Willfulness Is A Jury Question Here, As It Usually Is

Trans Union spends most of its brief arguing that no jury could find its conduct here to be willful. But "[w]illfulness under the FCRA is generally a question of fact for the jury." *Edwards v. Toys 'R' Us*, 527 F. Supp. 2d 1197, 1210 (C.D. Cal. 2007); *see also Seamans v. Temple Univ.*, 744 F.3d 853, 868 (3d Cir. 2014); *Horton v. Trans Union, LLC*, No. 12-2072, 2015 WL 1055776, at *10 (E.D. Pa. Mar. 10, 2015) ("[W]hether [defendant's] actions were objectively unreasonable, rising to the degree of 'reckless disregard' for its obligations under [§ 1681s-2(b) of] the FCRA, is a question for a jury."). This case is no different.

The FCRA prohibits both willful and negligent violations. 15 U.S.C. §§ 1681n, 1681o. In 2007, the Supreme Court "lowered the bar for what constitutes willful noncompliance" under section 1681n, clarifying that "willful" includes both knowing and reckless violations. *Slantis v. Capozzi & Assocs., P.C.*, 2010 WL 4878846, at *4 (M.D. Pa. Aug. 10, 2010) (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 56-57 (2007) (Congress intended the term "willfully" in FCRA section 1681n(a) to have its "common law usage," which "reach[es] reckless FCRA violations.")). *Safeco* set forth an objective test for determining whether a reckless violation of the FCRA is willful. It held that an agency does not "act in reckless disregard of [the FCRA] unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company

10

ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id*. at 69.

In assessing this risk, courts must consider whether a defendant's reading of the statutory text that resulted in the violation was "objectively unreasonable." *Id*. at 70. "To determine if a credit reporting agency's reading of the FCRA is objectively unreasonable, *Safeco* instructs courts to consider 1) whether the agency's interpretation has a "foundation in the statutory text," and whether there is 2) circuit authority or 3) regulatory guidance that "might have warned [Defendant] away from the view it took." *Norman II*, 669 F. Supp. 3d at 386.

**1.  Trans Union's Reading of The Statutory Text is Objectively Unreasonable**

The statutory text alone here is reason enough to deny Trans Union's summary judgment motion.

The Third Circuit has elaborated that an objectively unreasonable reading of the FCRA can be established under the text of the Act alone, and that no contrary "objectively reasonable reading" defense is possible where the text is clear, even in a case of first impression and in the absence of any guidance. *Cortez*, 617 F.3d at 722 ("the credit agency whose conduct is first examined under that section of the Act should not receive a pass because the issue has never been decided. The statute is far too clear to support such a license"); *Seamans*, 744 F.3d at 867-68 (willful violation is possible where statute cannot support a contrary interpretation).

Here, the statute is "far too clear" about the blocking procedure at issue. The Court has even noted this clarity with each one of Trans Union's key arguments. For example, when Defendant first insisted it was not required to "block" the information Kaplan requested, the Court soundly rejected that argument, noting "TransUnion's characterization of § 605B is belied by the statute's plain text." ECF 28 at 6.

11

When Trans Union subsequently argued its determinations of section 1681c-2(a) exceptions were compliant, the Court again found that "TransUnion's standardized fraud block procedure does not follow this clear statutory schema." ECF 87 at 12. "Section 1681c-2(a) requires—as signaled by the inclusion of the word 'shall'—that TransUnion must first block the relevant information, then only after a 'reasonable determ[ination]' may it decline to block. But that is not what TransUnion does." *Id*.

As if the statute were not clear enough, the legislative history supports the Court's plain text reading of the statute. The House Committee Report on the section that was eventually codified at section 15 U.S.C. § 1681c-2 provides:

> *Section 205. Blocking of information resulting from identity theft*
>
> This section amends section 605 of the Fair Credit Reporting Act to require consumer reporting agencies to block certain information . . . . Within 5 business days [reduced to 4 in the final version] of receiving this information, the consumer reporting agency <u>must block the information</u>.
>
> The consumer reporting agency is also required to notify promptly the entity that furnished the blocked information . . . If a consumer reporting agency <u>that has placed a block on a consumer's file</u> reasonably determines that (1) the information was blocked in error or a block was requested by the consumer in error; (2) the information was blocked (or requested to be blocked) on the basis of a misrepresentation of fact by the consumer; or (3) the consumer knowingly obtained goods, services or money as a result of the block, <u>then the consumer reporting agency may decline to block, or may rescind a block of the information.</u>

House Report to accompany H.R. 2622 (Sept. 4, 2003), available at https://www.congress.gov/committee-report/108th-congress/house-report/263/1 (emphasis added).

This legislative history makes plain that Congress envisioned that agencies like Trans Union "must block" information that resulted from alleged identity theft under sub-section c-

2(a) and that an agency that "has placed" a block may "then . . . decline to block" if it reasonably determines that one or more of the factors set forth in sub-section c-2(c) has been met. The sequencing is clear – first there must be a "block," and then a declination or rescission, which can take place only after a reasonable determination by the agency about the three specific elements enumerated in sub-section c-2(c), not other factors. Trans Union apparently created those other factors out of whole cloth – not from any reasonable reading of sub-section c-2(c).

Rather than even attempt to explain how its internal factors mirror or even relate to the three statutory exceptions, Trans Union's argument on the statutory text simply walks through the language of the statute and states in conclusory fashion that its "policies and procedures track the language of 605B." ECF 82-1 at 18. That argument creates a bold mischaracterization by glossing over the facts of this case. Trans Union may be able to point to some broad policies that spell out the exceptions in section 1681c-2(c),[3] but the key denial criteria at issue here say nothing about "error" or "misrepresentation" or a consumer receiving the goods. Facially, these internal factors bear absolutely no resemblance to the text of the exceptions in section 1681c-2(c). For example, the mere fact that a tradeline reflects a mortgage or auto loan is not a basis to conclude that the

---

[3]      Trans Union criticizes Plaintiff for focusing on these seven denial criteria rather than its "suite of policies and procedures" (ECF 82-1 at 17), but this is simply misdirection, given the clear testimony that the "Fraud Block Denial Reasons" procedure document (JA 194-96) is Trans Union's "internal policy" for processing identity theft block requests. JA 499-500 at 51:25-52:16; JA 475 at 38:15-22; JA 476 at 39:11-23; JA 101 at 45:5-23. Indeed, Trans Union says so itself in its statement of facts supporting its motion. ECF 82-2 at ¶ 40.

Perhaps even more importantly, Trans Union's assertion that its "fraud agents followed its policies and procedures to reasonably determine that Ms. Kaplan's request to block the Target Charge was made in error" (ECF 82-1 at 17) is entirely lacking in factual support.  Trans Union's own witness conceded that it would require speculation or guessing to know the reasons that the agent declined Plaintiff's block request, and Trans Union does not keep records sufficient to identify the documents the agent review or the specific reason(s) for denial of block request. JA 478-79 at 66:21-67:5; JA 480-81 at 96:9-97:1; JA 482-85 at 112:3-115:6; JA 488 at 11:16-24; JA 494-97 at 43:21-46:19; JA 397-401 at Am. Supp. Ans. 4-6; JA 427-28 at RPDs 6-7.

consumer's block request was an error or mistake, and Trans Union provides no facts supporting such a conclusion.

Professor Roosevelt's expert opinion helps explain this concept to the jury. As Mr. Roosevelt explains,

> Trans Union's seven criteria for denial are not the same as the statutory grounds on which a CRA is permitted to decline a block request. They are probably relevant to the question of whether identity theft occurred. If the statute authorized a CRA to develop a reasonable policy to form a reasonable belief about whether something is wrong with the consumer's request, this policy might satisfy that demand. But the statute does not tell CRAs that they may deny a block request based on a reasonable belief that something is wrong with the request. It lists specific grounds.

JA 339. By creating denial criteria that were so different from the grounds listed in section 1681c-2(c), Trans Union ran a high risk that of violation the FCRA and perpetuating the type of harm that the FCRA sought to prevent. Viewed in a light most favorable to Plaintiff, there is a question of fact as to whether that risk was substantially greater than a mere careless reading of the statute.

### 2. There Also is Case Law to Put Trans Union on Notice About its Obligations

After glossing over the mismatch between its policies and the statutory text, Trans Union next asserts there is a "dearth of contradictory regulatory guidance and precedential decisions," (ECF 82-1 at 19) to warn it otherwise. Needless to say, if a statute says that *only* A, B, and C are permissible, then no additional precedent is needed to inform a company that L, M, N, O, and P are *not* permissible.

Nevertheless, in light of the plain text of the statute, there is sufficient precedent to warn Trans Union about its conduct. For example, the Tenth Circuit laid out the clear sequential process this Court noted well over a decade ago:

> [CRAs] must also block the reporting of any information identified by the consumer as resulting from identify theft. *Id.* § 1681c–2. The block must generally take effect upon proof of the consumer's identity and receipt of an identity-theft report, but, as a concession to the consumer-data industry, Congress allowed CRAs to override the block if they reasonably determine it was requested in error or on the basis of a misrepresentation. *Id.* § 1681c–2(c).

*Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 901 (10th Cir. 2012). Notably, this map is identical to the section 1681c-2 roadmap that this Court previously laid out when it ruled, "TransUnion must first block the relevant information, then only after a 'reasonable determination' may it decline to block. But that is not what TransUnion does." ECF 87 at 12.

And other courts have warned CRAs, including Trans Union, that they cannot create their own bases to decline blocks. *See e.g.*, *Haykuhi Avetisyan v. Experian Info. Sols., Inc.*, No. CV 14-05276-AB (ASX), 2016 WL 7638189, at *12 (C.D. Cal. June 3, 2016) ("Trans Union provides no law suggesting that these are legitimate bases for declining to block."); *Osada v. Experian Info. Sols., Inc.*, No. 11 C 2856, 2012 WL 1050067, at *4 (N.D. Ill. Mar. 28, 2012) (blocking denials "require an actual determination that there was fraud or mistake").

Moreover, as a general matter, Trans Union has long been on notice that it cannot offload its clear duties onto furnishers. For example, and as discussed further below, CRAs have general duties to "reinvestigate" consumer disputes under section 1681i. In 1997, Trans Union was admonished by the Third Circuit for simply parroting information from the furnisher. As the Third Circuit warned, "a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). Nevertheless, after being admonished by the Third Circuit about this illegal burden shifting 30 years ago, Trans Union is now attempting again to offload its duties onto furnishers – this time, under section 1681c-2.

15

Defendant is not shy about this offloading. As Defendant makes clear throughout its briefing, "the furnisher of credit information stands in a far better position to make a thorough investigation of disputed debt than a credit reporting agency," ECF 82-1 at 29 (citations and quotations omitted). This illegal burden-shifting is also seen in the body of Letter 775, which facially indicates that Trans Union is kicking the request over to the furnisher for investigation. JA 237 ("TransUnion will contact the source of the disputed information"). Plaintiff's expert Evan Hendricks even explains the profit motive for CRAs like Trans Union to enact such a policy: because the furnishers who provide data to the CRAs are also the CRAs' customers who pay to receive credit reports, CRAs are incentivized to let furnishers have the last word on whether information should be blocked.  JA 551-52. Thus, despite clear guidance, including from the Third Circuit, Trans Union continues to duck its FCRA duties to consumers by shifting the burden and passing off their disputes and requests to furnishers.  This conduct is deliberate, planned, and rooted in Trans Union's history. It further supports a willful violation of the FCRA.

### 3.  There are Genuine Issues of Material Fact Regarding Trans Union's Willfulness

Against that backdrop of law, there are genuine factual disputes as to whether Trans Union willfully violated section 1681c-2 through its policies and Letter 775. These disputes should be for the jury to resolve.

At the center of this case is Trans Union's "Fraud Block Denial Reasons." JA 194-96. This policy specifically instructs agents to send Letter 775 if any of the criteria are met. JA 195. These factors look to various things like whether the account is a car loan, account opening dates, payment history, account status, and prior disputes. *Id*.

As outlined throughout the briefing here, and elsewhere in this case, these criteria do not line up with the statutory text, nor is there any indication in the record that these criteria constitute

evidence of an error or misrepresentation by the consumer. Section 1681c-2(c) does not give the CRA discretion to block if the agency "reasonably determines" the consumer made twelve consecutive payments on an account, or if the blocking request is the consumer's second dispute. JA 195. Trans Union presents no evidence whatsoever that these criteria are related to identity theft; for example, a consumer may dispute the accuracy of an item on their credit report they did not recognize, and then later realize that they had been the victim of identity theft.  JA 340.

Further, the plain text of the statute does not give CRAs discretion to block for any of the factors listed in Trans Union's "Fraud Block Denial Reasons," but only for misrepresentation or error in the request, or when the consumer has actually received the goods. *See* 15 U.S.C. § 1681c-2(c). Notably, those three criteria are wholly absent from the company's Fraud Bock Denial Reasons, which are the criteria that Trans Union admits that it used with respect to Plaintiff and all class members here. JA 397-401 at Am Supp. Ans. 4-6; JA 501-03 at 64:20-66:1.

Despite the obvious incongruence between these criteria and the statute, Trans Union maintains its position that the "proxies" are all "anchored to the FCRA's requirements" and that these criteria are "based on its actual experiences with consumers." ECF 82-1 at 20. Notably, however, Trans Union entirely fails to back up either of these sweeping claims that are central to resolution of this case with *evidence.* Its sole citation is to the rebuttal expert report of Mr. Kubes, which contains generalizations about what CRAs "often" do to develop policies and procedures, but no facts whatsoever about what Trans Union's policies at issue here are actually based on.  For all the record here shows, they are entirely arbitrary.

Perhaps if Trans Union had come forward with statistical evidence or studies regarding the connection between its Fraud Block Denial Reasons and the elements FCRA section 1681c-2(c), the story might be different. But the record lacks any evidence whatsoever as to how Trans Union

17

developed these so-called "proxies." Do the proxies predict one of the statutory exceptions with 99% accuracy? With 5% accuracy? Are they developed completely randomly? Professor Roosevelt will explain to the jury how the statute limits a CRA's discretion in developing a policy in this context and offer a better policy. JA 339-41. Further, as Mr. Hendricks will explain, there are economic incentives for Trans Union to find reasons to deny the blocking request and punt the ultimate decision over to its furnisher-bank customer. JA 550-51. Those economic incentives, combined with the facial mismatch between Trans Unions' "proxies" and the statutory exemptions, is sufficient of evidence for the jury to make a finding of willfulness, especially with all reasonable inferences drawn in Kaplan's favor.

Implicitly acknowledging that its Fraud Block Denial Reasons do not conform with the statutory text, Trans Union's brief deflects attention away from that policy and simply characterizes it as just one of many "trees" in a wide "forest" of policies. ECF 82-1 at 20. But the other trees in that forest bear no relevance to the purported "determinations" made under section 1681c-2(c). ███████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████



JA 191. Thus, all roads winding through Trans Union's forest of policies end with the company's

Fraud Block Denial Reasons. And Trans Union itself acknowledges, the Fraud Block Denial

Reasons policy is its "internal policy" for processing identity theft block requests. *See* ECF 82-2

at ¶ 40; JA 336-353.

The jury can also find Trans Union willfully violated the FCRA through its Letter 775. In

each of the over 280,000 copies of Letter 775 sent to the class members here, Trans Union

represented that it "determined" that one of the three statutory exceptions to blocking applied. JA

237. But a reasonable jury could conclude from the record here that no such determinations

actually took place. Trans Union agents are clearly instructed to apply the unrelated Fraud Block

Denial Reasons when determining whether to send Letter 775.  JA 195.  And Trans Union cannot

even identify which of those reasons applied. JA 478-79 at 66:21-67:5; JA 480-81 at 96:9-97:1; JA

482-85 at 112:3-115:6; JA 488 at 11:16-24; JA 495-98 at 43:21-46:9; JA 427-28 at RPDs 6-7.

Through Letter 775, Trans Union represents to consumers that it applies the statutory criteria in

19

section 1681c-2(c) – but it does not, and it does not even know which of its own internal criteria it did apply.

The fact that Trans Union is not required under FCRA section 1681c-2(c)(2) to provide the specific reason for the denial is of no moment – having chosen to provide a reason in Letter 775, Trans Union was obligated to provide consumers with the real reason. As detailed above, a reasonable jury could conclude that it did not, and instead misrepresented to consumers that it was directly applying the statutory criteria in FCRA section 1681c-2(c). Such a misrepresentation falls directly within the scope of the misrepresentations and concealments that courts have found to support a finding of willful misconduct under the FCRA.  *Cushman*, 115 F.3d at 227; *Ramirez v. Trans Union, LLC*, No. 12-cv-00632-JSC, 2017 WL 5153280 at *9 (N.D. Cal. Nov. 7, 2017) (upholding jury finding of FCRA willfulness based in part upon evidence that Trans Union made misrepresentations to consumers in a "courtesy" letter, and to government regulators regarding the nature of its disclosures) a*ff'd Ramirez v. TransUnion LLC*, 951 F.3d 1008, 1032 (9th Cir. 2020), *rev'd and remanded on other grounds,* 594 U.S. 413 (2021).

The willfulness inquiry is, at bottom, a question of whether Trans Union's practices were reckless – a foundational jury question. Trans Union's motion for summary judgment must therefore be denied.

**D.    Given The Clear Statutory Text, Trans Union Cannot Meet Its High Burden To Show The Statute Is Unconstitutionally Vague**

In a strained attempt to escape the plain language of section 1681c-2, Trans Union argues that the statute is so vague as to be meaningless and unconstitutional. Not so.

As a threshold matter, the Court does not even need to reach this constitutional question. It has long been true that "[i]t is not the habit of [federal] court[s] to decide questions of a constitutional nature unless absolutely necessary to a decision of the case." *Burton v. United States*,

20

196 U.S. 283, 295 (1905). "Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter." *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936).

Here, there is simply no need to address the constitutional question. According to Trans Union, the crux of the constitutional issue is that the wording of section 1681c-2(c)(1) is allegedly too vague because, although Congress lists three specific factors that can form the basis for a CRA to decline a consumer's block request, Congress does not also "identify the means" by which Trans Union can reasonably determine when one of more of those factors applies.   ECF 82-1 at 25. But whether procedures are permitted under section 1681c-2(c) is beside the point in this case because Trans Union never blocked under section 1681c-2(a). *Id.* at 20. Moreover, Trans Union does not even consider the three factors listed under 1681c-2(c), because it has a policy focused on completely different factors. JA 194-96. So the question about "identifying the means" by which to reasonably determine the three factors of 1681c-2(c) is hypothetical and never reached in this case.

Moreover, the clear text of section 1681c-2(c) outlines exactly the three, and only three, factors that permit a CRA to decline or rescind a block.  What Trans Union needs is a factual basis to support any of these three factors, not any further clarification to an already detailed statutory provision.  Per the text of the statute, and as confirmed by Kermit Roosevelt, the statute does not give CRAs discretion to make determinations about other factors. JA 340. There is no discretion for proxies, or for any other factors CRAs may think are relevant to making identity theft determinations, or for a totality of circumstances approach. In other words, if the statute permits three different types of apples, then it is wholly irrelevant that Trans Union has factors to determine whether something is an orange.

21

In the unlikely event the Court were moved to address the constitutional question anyway, Trans Union cannot meet the high threshold for showing unconstitutionality. There is a "strong presumptive validity that attaches to an Act of Congress" such that "statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963); *Robinson v. Holiday Universal, Inc.*, No. CIVA 05-5726, 2006 WL 2642323, at *5 (E.D. Pa. Sept. 11, 2006) ("the burden of showing that a statute is unconstitutional is a heavy one."). Moreover, "'[l]esser degrees of specificity' are allowed in civil cases because the consequences are smaller than in the criminal context." *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 250 (3d Cir. 2015) (citing *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1135 (3d Cir.1992)). "The standards are especially lax for civil statutes that regulate economic activities. For those statutes, a party lacks fair notice when the relevant standard is 'so vague as to be no rule or standard at all.'" *Id.* (quoting *CMR D.N. Corp. v. City of Phila.*, 703 F.3d 612, 631–32 (3d Cir. 2013)).

Trans Union cannot meet its heavy burden to show section 1681c-2 is unconstitutionally vague. In fact, as this Court has already observed, there is a "clear statutory schema" laid out in the section. ECF 87 at 12. The statute is clear and Defendant's argument fails.

## E.    Trans Union Further Failed Its Reinvestigation Duties Under Section 1681i

Not only did Trans Union fail in its blocking duties here, but when the company kicked the dispute over to Wells Fargo, it also failed to conduct its own independent reinvestigation of the matter.

The standard mechanism for credit reporting disputes is found at section 1681i. Under those provisions, credit reporting agencies have a 30-day window to "promptly reinvestigate any information in a consumer's file that is disputed by a consumer and either record the current status

22

of the information in dispute or delete it." *Cortez*, 617 F.3d at 712–13. Any reinvestigation of a consumer dispute must be "reasonable." 15 U.S.C. § 1681i(a)(1)(A). "The 'grave responsibilit[y]' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Cushman*, 115 F.3d at 224-225 (emphasis added). After all, "Congress… delegated to the agencies a front-line role in adjudicating disputes." *Norman I*, 479 F. Supp. 3d at 124.

Here, Trans Union does not even attempt to argue that it conducted a reasonable reinvestigation. Instead, the company strains to characterize the dispute as a "legal" one or as a "collateral attack," or as one that is allegedly not "objectively and readily verifiable." Thus, in Trans Union's view, it is excused it from conducting any reinvestigation into Kaplan's dispute whatsoever. This position greatly oversteps the applicable standards under section 1681i.

First, the reinvestigation process was unnecessary from the start. Kaplan never asked for a reinvestigation. She requested a block, which (as outlined above) is an entirely different process. Trans Union itself recognized this and treated her communication as an identity theft block request. JA 477 at 42:1-4; JA 489 at 21:2-16; JA 490-91 at 24:19-25:4; JA 494 at 31:4-10. In response, Trans Union did not need to conduct a reinvestigation with the furnisher at all, it needed to block the information.  15 U.S.C. § 1681c-2(a).

Nevertheless, Trans Union opted to ignore its affirmative obligation to block pursuant to section 1681c-2(a), invoked the reinvestigation process, and through that process kicked the question over to the furnisher via an ACDV form. JA 166. It did so because, in Trans Union's view, Wells Fargo was in a much better position to resolve this dispute. ECF 82-1 at 28-29. But then Trans Union did not even do the "reinvestigation" it promised. JA 237 ("we have opened a

23

reinvestigation of the disputed information"). It simply sent Plaintiff's dispute to Wells Fargo and parroted the response received.  JA 166; JA 504-06 at 69:25-71:9; JA 555.  That conduct alone is enough for the 1681i claim to reach the jury under *Cushman*, 115 F.3d at 224-25.

Trans Union now claims that it was not required to review the 1681i dispute <u>at all</u> for various technical reasons. As a result, Trans Union only parroted back the information from Wells Fargo, which is precisely what the Third Circuit long ago warned the company against. *See Cushman*, 115 F.3d at 225 (the "'grave responsibility' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources."). As Mr. Hendricks explains in his expert opinion, there are economic incentives for the CRAs to defer determinations over to their furnisher-bank customers. JA 551-552.

Second, in order to avoid its reinvestigation duties, Trans Union cites to a somewhat recent body of convoluted case law where courts have carved out from section 1681i some limited types of disputes. Some of those courts distinguish between "legal" and "factual" disputes, and some courts look to whether the disputed information is "objectively and readily verifiable." To be clear, nothing in the text of the FCRA distinguishes between types of inaccuracies. The text makes no reference to "legal" inaccuracies and "factual" inaccuracies, and it says nothing about the inaccuracy needing to be "objectively and readily verifiable." In fact, the broad mandate of the section 1681i reinvestigation process applies to the "completeness or accuracy of any item of information." 15 U.S.C. § 1681i(a)(1)(A) (emphasis added); *see also Sessa v. Trans Union, LLC*, 74 F.4th 38, 43 (2d Cir. 2023) ("there is no threshold inquiry under the FCRA as to whether any purportedly inaccurate information is legal or factual in nature"). The distinction between "legal" and "factual" inaccuracies, or as to "objectively and readily verifiable" information is judicial gloss from the start. And the Third Circuit has not yet provided its view on this evolving gloss.

But even if that judicial gloss were applied in the Third Circuit, Kaplan's dispute would present a simple factual issue – did she make the charges at Target or was it a fraudster who made them?  Her police report alone is factually sufficient to support fraud.  As Professor Roosevelt opines, the criminal penalties connected with false police and identity theft reports are sufficient for a CRA to presume fraud. JA 340. Once a consumer has undertaken these congressionally-outlined steps, the result must necessarily become an identity theft report that is "objective and readily verifiable" proof of the fraud. Otherwise, why would Congress have outlined this burden for consumers to obtain objective proof of identity theft?

The legal/factual distinction applied in other jurisdictions fares no better for Trans Union, as Kaplan meets that standard also. Identity theft is a quintessentially a factual dispute, where a single question is at issue: did Kaplan make the charges at Target, or was it someone else? There are no legal determinations to be made to resolve such an inquiry. There is no application of law. Kaplan overcame the substantial burden necessary to prove a negative: that she did not make the purchase, and she supported this assertion with the exact kind of proof set forth by Congress, a sworn statement subject to the penalty of perjury. JA 084-95. No further finding is needed.

Many other courts agree with this simple reasoning in the context of identity theft. *See Suluki v. Credit One Bank, NA*, 666 F. Supp. 3d 403, 410-12 (S.D.N.Y. 2023) (question of fact regarding whether plaintiff's mother opened plaintiff's subject account); *see also Simonson v. IQ Data Int'l, Inc.*, 698 F. Supp. 3d 1055, 1064 (W.D. Wis. Oct. 16, 2023) (finding that information furnisher provided CRA was "inaccurate" because it was the product of identity theft); *Lara v. Experian Info. Sols., Inc.*, 625 F. Supp. 3d 1062, 1074 (S.D. Cal. 2022) (denying summary judgment in alleged identity-theft case); *Romero v. Monterey Fin. Servs., LLC*, No. 19-CV-1781 JM (KSC), 2021 WL 268635, at *4 (S.D. Cal. Jan. 27, 2021) (same); *Wood v. Credit One Bank*,

277 F. Supp. 3d 821, 848-49 (E.D. Va. 2017) (finding that bank's reporting that plaintiff opened and was responsible for the account was "inaccurate"); *Rubin v. HSBC Bank USA, NA*, 717 F. Supp. 3d 266, 270 (E.D.N.Y. 2024) ("The sole question is purely factual — whether Rubin or someone else activated the account and made the BJ's purchase.").

Some of the key authority relied upon by Trans Union misses crucial pieces of this analysis. For instance, citing *Reyes v. Equifax Info. Servs., L.L.C.*, 140 F.4th 279 (5th Cir. 2025), Trans Union attempts to stick its head in the sand and pretend that it had no possible way to conduct an investigation into this matter. ECF 82-1 at 29. But the analysis in *Reyes* overlooked the key structure created by Congress in section 1681c-2, where victims of identity theft could obtain relief with four pieces of information. Instead, *Reyes* seemed to wrongly believe that an identity theft victim could only prove fraud through an "adjudicated position that the debt is not legally valid." *Reyes*, 140 F.4th at 287. If that were truly the standard, then the identity theft protections added to the FCRA would be rendered meaningless. The case of *DeAndrade v. Trans Union LLC*, is even further askew. In that case, there is not even a mention of the plaintiff obtaining a police report or any of the other statutorily required evidence, or a sworn statement subject to the penalty of perjury, to prove identity theft. 523 F.3d 61, 63-64 (1st Cir. 2008).

Here, there is more than sufficient evidence from which a reasonable jury could conclude that Trans Union failed to conduct a reasonable reinvestigation: although Plaintiff provided evidence subject to the penalty of perjury that the disputed information was the result of identity theft and thus had no place in her credit file, Trans Union simply parroted the response of its furnisher Wells Fargo.  Trans Union has known for nearly thirty years that such a procedure is unreasonable, and such practices cannot support summary judgment in Trans Union's favor now. *Cushman*, 115 F.3d at 225.  Trans Union's motion must be denied.

## V.    CONCLUSION

For the reasons set forth herein, Plaintiff respectfully requests that Trans Union's motion for summary judgment (ECF 82) be denied in its entirety.

Dated: June 4, 2026

Respectfully,
LESLEY KAPLAN
by her attorneys,

**BY:** /s/ *John Soumilas*
John Soumilas
James A. Francis
Lauren KW Brennan
**FRANCIS MAILMAN SOUMILAS, P.C.**
1600 Market Street, Suite 2510
Philadelphia, PA 19103
(T) 215-735-8600
(F) 215-940-8000
jsoumilas@consumerlawfirm.com
jfrancis@consumerlawfirm.com
lbrennan@consumerlawfirm.com

Erika A. Heath
**FRANCIS MAILMAN SOUMILAS, P.C.**
351 California Street, Suite 700
San Francisco, CA 94104
(T) 628-246-1352
(F) 215-940-8000
eheath@consumerlawfirm.com

*Attorneys for Plaintiff and the Class*

27

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was electronically filed on this date and that service is therefore being made electronically on counsel of record for Defendant.

Date: June 4, 2026                                    */s/ John Soumilas*

                                                     John Soumilas

28